In re William C. McKNEW, Debtor.

KMK Factoring, L.L.C., Diversified Investments, L.P., Plaintiff,

v.

William C. McKnew, Defendant.

Bankruptcy No. 00–51364–S.
Adversary No. 01–5005.

United States Bankruptcy Court,
E.D. Virginia,
Newport News Division.

Nov. 2, 2001.

David K. Spiro, Cantor Arkema & Edmonds, P.C., Richmond, VA, for debtor.

Peter V. Chiusano, Willcox & Savage, P.C., Norfolk, VA, for creditor.

## Memorandum Opinion and Order

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter comes on for trial of the Complaint of KMK Factoring, L.L.C. and Diversified Investments, L.P. to determine the dischargeability of certain indebtedness the debtor, William C. McKnew, allegedly owes them, respectively. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Bankruptcy Procedure 7052.

## Findings of Fact

KMK Factoring, L.L.C. ("KMK") is a limited liability corporation formed to own and operate "Commission Express" franchises. Commission Express National, Inc. of Fairfax, Virginia sells "Commission Express" franchises and provides a system in which licensed real estate brokers and agents can factor their real estate commissions. The operation of a Commission Express franchise involves purchasing a real estate agent's right to collect his or her full commission at closing of the real estate transaction. The franchisee purchases the right prior to the closing at a discount rate. The difference between what a franchisee pays for the commission receivable purchased and the amount collected at closing, constitutes the gross profit of the franchisee.

The debtor, William C. McKnew ("McKnew") first became aware of Commission Express in 1995 when he, as a customer, utilized the factoring services of a franchisee.[1] In the Spring of 1997, McKnew approached Robert C. Kidd ("Kidd") and Walter D. Kelley, Jr. ("Kelley") about the possible business opportunity of acquiring a Commission Express franchise. Kidd, an ordained minister who is presently self-employed in the area of mortgages, building and development, met McKnew in 1996. Kelley is an attorney who previously represented McKnew in certain litigation unrelated to KMK. After experiencing a favorable outcome in such litigation, McKnew and Kelley continued their relationship.[2] Kidd and Kelley had not met prior to the formation of KMK.

The original plan made Kidd and Kelley primarily "outside" investors who supply the necessary capital while relying on McKnew to manage the business operation. Initially, Kidd invested $10,000.00 in the venture. Despite the initial *pro forma* budget for this new business requiring approximately $100,000.00 in venture capital, Kelley committed himself to invest $125,000.00 because of his belief "that some of the projections were a little bit ambitious." (Tr. at 173.) Operating a Commission Express franchise requires two types of capital, venture capital and factoring capital. Venture capital consisted of the monies invested for the purpose of funding normal business operations or as Kelley described it, the monies "necessary to keep the lights on, pay Mr. McKnew, things like that." *Id.* The second source of capital, known as "factoring capital," serves as the basis to permit the Commission Express franchise to purchase receivables and is maintained in a segregated account. Specifically, the company utilized factoring capital to purchase real estate commissions from real estate agents. Two sources supplied the factoring capital for KMK Factoring. Tom Carr, an attorney in Richmond, Virginia, who also owned a Commission Express franchise, operated initially as a lender of factoring capital. KMK had a loan agreement with Tom

---

1. McKnew in cross-examination admitted he factored a commission and subsequently defaulted on repayment, resulting in the Commission Express franchisee obtaining a confessed judgment against him.

2. The prior litigation in which Kelley represented McKnew, terminated, and all other legal work undertaken by Kelley for McKnew terminated, prior to McKnew and Kelley discussing a possible investment in a Commission Express franchise.

Carr restricting the use of monies advanced by him to the purchase of receivables. (Tr. at 303, 370.) Diversified Investments, L.P., a partnership composed of Kelley and other family members ("Diversified"), also supplied factoring capital.[3] McKnew understood monies advanced by Diversified were earmarked for purposes of purchasing receivables.[4]

KMK was incorporated in July 1997 as a Virginia limited liability company. The plan made Jennifer J. Kelley, the wife of Kelley ("Mrs. Kelley"), a member owning fifty percent (50%) of KMK; McKnew was to own forty-five percent (45%) and Kidd owned five percent (5%). The plan further stated McKnew was co-manager of the venture along with Kelley. (Tr. at 297.) Prior to the formation of KMK, the Commission Express business operated through Colony Holdings, Ltd. ("Colony Holdings"), a corporation owned by McKnew and conducted business from his home office, with monies of this business passing through a Colony Holdings' bank account to the KMK owners.

Kidd, Kelley and McKnew, addressed the issue of compensation to McKnew early in the formation of KMK. They agreed McKnew could receive $10,000.00 per month so long as the initial venture capital existed or KMK's net profits could fund such a salary.[5] McKnew prepared an operating *pro forma* and promulgated it to Kelley and Kidd. (Pls.Ex. 27.) The *pro forma* listed $10,000.00 a month as compensation for management starting in June 1997 until January 1998, when the monthly amount increased to $10,417.00. *Id.* The *pro forma* continued this amount until January 1999, when the listed management salary increased to $12,500.00, which continued until the end of three years of operation.[6] Consistent with the plan to segregate venture capital from factoring capital, McKnew, Kidd and Kelley also agreed to limit monies borrowed by KMK to the purchase of commission receivables and not for the payment of any operational

3. The Diversified monies consisted of a promissory note dated September 12, 1997 in the amount of $40,000.00, a promissory note dated October 1, 1997 in the amount of $35,000, and a promissory note dated June 9, 1998 in the amount of $25,000.00 (Def.Ex. CK.)

4. McKnew testified "Diversified Investments was his family's trust that I guess he was the administrator of, and those funds, as I understood it, he wanted earmarked specifically for the purchase of receivables and was very concerned about that." (Tr. at 304.)

5. Kidd objected to McKnew receiving $10,000.00 a month as excessive. Kidd expressed this concern to Kelley; but apparently, McKnew convinced Kidd that Kelley and McKnew had already agreed to this amount prior to Kidd meeting Kelley for the first time. Kidd described these concerns as follows:

> Q. Did you and Mr. McKnew and Mr. Kelley have discussions about this $10,000.00 a month payment?
> A. The three of us together I don't recall ever having serious discussions. I had talked with Mr. Kelley about it and expressed concern that it was twice the amount that I thought a start-up business should be expected to sustain in management. But on the way to meet Mr. Kelley for the first time, it was made clear to me by Mr. McKnew that the two of them had agreed upon this amount as his initial compensation.
> Q. So if I am understanding you correctly, you thought that was too much?
> A. Yes. I did.
> Q. Did you say that to Mr. Kelley and Mr. McKnew?
> A. I said it to Mr. Kelley. But I wasn't vehement about it since the vast majority of the venture capital money was his.
> (Tr. at 55–56.)

6. McKnew contends Kelley, Kidd, and he, had an agreement that McKnew would receive the amount of compensation required to support the needs of McKnew's family as cash flow permitted. For the reasons heretofore described, the Court finds McKnew's assertion is not credible.

expenses. They further agreed to maintain these funds in two separate categorical items. (Tr. at 57.) The agreement between Kelley, Kidd and McKnew as to the payment of expenses at the outset of KMK's operations was less clear. McKnew initially paid some legitimate business expenses from the monies KMK paid him, but apparently KMK would have reimbursed McKnew for expenditures which benefitted the company. McKnew did not submit expense reports until after September 1998. (Tr. at 140–41.)

KMK commenced operations in early July 1997. On July 28, 1997, McKnew prepared and forwarded to Kidd and Kelley a memorandum providing financial information concerning the first twenty-seven days of operations of the Commission Express franchise. (Pls. Ex. 28.) McKnew's memoranda urges finalization of the organizational documentation and attaches a "CE of Tidewater Funding Request" indicating pending total expenditures of $15,010.00, cash available of $2720.00, and the necessity of injecting $12,290.00 into the business. The pending expenditures, in addition to items relating to office occupancy, printing and market-ing, included for August 1997 "consulting" in the amount of $10,000.00. Attached also was a "CE Tidewater–Expense Statement (Cash) 6/1/97 through 7/26/97." *Id.* This expense statement shows that from June 9, 1997 through July 1, 1997 McKnew received $20,000.00 in compensation for consulting.[7] During the month of June 1997, McKnew actually paid himself $8,725.89. (Pls.Ex. 3, 15.)

The business operations of KMK continued and McKnew provided to Kelley and Kidd a "CE/Tidewater–Income Statement (cash) 6/1/97 through 9/9/97," which detailed monies invested into KMK and monies expended by KMK for the relevant time period. This document, prepared by McKnew, listed his paid compensation as $30,000.00 from June 6, 1997 through July 30, 1997. (Pls.Ex. 14.)[8] Kelley and Kidd reviewed this document and found the compensation consistent with their agreement with McKnew, that is, $10,000.00 a month. In his own handwriting, McKnew further noted on the document an extension of the expense listings through a later period, which indicated that McKnew had received $40,000.00 at that point in time.[9]

7. The payment dates and amounts as listed in this statement were as follows:

| Date | Amount |
|------|--------|
| 06/09/97 | $ 300.00 |
| 06/13/97 | $ 100.00 |
| 06/14/97 | $ 3,000.00 |
| 06/15/97 | $ 500.00 |
| 06/15/97 | $ 1,925.89 |
| 06/17/97 | $ 2,000.00 |
| 06/24/97 | $ 500.00 |
| 07/01/97 | $11,274.11 |
| Total | $20,000.00 (sic) |

(Pls.Ex. 28.) The statement incorrectly totals the amounts listed as $20,000, instead of the correct total of $19,600.00. This mistake apparently occurred because of a $400.00 payment made on 6/6/97 to McKnew which was omitted here but does appear on the "CE/Tidewater–Expense Statement (Cash) 6/1/97 through 9/9/97." (Pls.Ex. 14.)

8. The payments listed as made to McKnew and the dates thereof are as follows:

| Date | Amount |
|------|--------|
| 06/06/97 | $ 400.00 |
| 06/09/97 | $ 300.00 |
| 06/13/97 | $ 100.00 |
| 06/14/97 | $ 3,000.00 |
| 06/15/97 | $ 500.00 |
| 06/15/97 | $ 1,925.89 |
| 06/17/97 | $ 2,000.00 |
| 06/24/97 | $ 500.00 |
| 07/01/97 | $11,274.11 |
| 07/18/97 | $ 500.00 |
| 07/22/97 | $ 500.00 |
| 07/28/97 | $ 500.00 |
| 07/30/97 | $ 8,500.00 |
| Total | $30,000.00 |

9. The handwritten extension on the first page of the income statement, after listing additional monies injected by Kelley, subtracts the figure "<40,000> Bill" as an expense, among others, to illustrate the then existing bank balance.

However, these listings of McKnew's salary payments from KMK were incomplete.[10] In July 1997, McKnew paid himself a total of $21,480.87. (Pls.Ex. 3, 22.)[11] In August 1997, McKnew paid himself a total of $16,000.00. (Pls.Ex. 3, 30.)[12] In September 1997, McKnew paid himself through checks to Colony Holdings, a total of $14,250. (Pls.Ex. 3, 36.)[13] Thus, while McKnew had represented to Kelley and Kidd that he received $30,000.00 through July 30, 1997 and $40,000 through September 1997, McKnew actually paid himself $30,206.76 through July 30, 1997, $46,206.76 through August 31, 1997 and $60,456.76 through September 30, 1997. Stated another way, by September 30, 1997, McKnew paid himself $20,456.76 more than he represented to Kelley and Kidd, and $20,456.76 more than authorized by his agreement with Kelley and Kidd.

10. A review of Colony Holdings bank account conducted by Mrs. Kelley indicates KMK paid McKnew by drawing a check to Colony Holdings, which would be deposited in Colony Holdings' bank account. McKnew would then draw a check on Colony Holdings' checking account payable to himself.

11. The actual amounts paid to McKnew through Colony Holdings, were as follows:

| Check Number | Date | Amount |
| --- | --- | --- |
| 1028 | 07/01/97 | $11,275.00 |
| 1049 | 07/15/97 | $ 500.00 |
| 1058 | 07/22/97 | $ 500.00 |
| 1059 | 07/25/97 | $ 205.87 |
| 1068 | 07/28/97 | $ 500.00 |
| 1071 | 07/30/97 | $ 8,500.00 |
| | | $21,480.87 Total |

12. The amounts actually paid to McKnew, by way of checks made payable to Colony Holdings, were as follows:

| Check Number | Date | Amount |
| --- | --- | --- |
| 1082 | 08/05/97 | $ 400.00 |
| 1086 | 08/06/97 | $ 1,100.00 |
| 1089 | 08/07/97 | $ 1,000.00 |
| 1101 | 08/15/97 | $ 2,000.00 |
| 1107 | 08/20/97 | $ 500.00 |
| 1108 | 08/21/97 | $ 3,000.00 |
| 1109 | 08/27/97 | $ 4,000.00 |

McKnew ran the business operations of KMK throughout the fall of 1997 and into 1998. Financial reporting on the business operations was scarce. KMK then engaged Carter, Corbin and Company, a public accounting firm, to prepare financial statements. They prepared a draft Balance Sheet as of December 31, 1997. (Def.Ex. Z.) Kidd recalls seeing this statement some time in early 1998. The profit and loss portion of this draft Balance Sheet, under the Expense section, contained an entry under professional fees identified as "Consulting—Other 121,-136.00." Kidd understood the figure represented fees to McKnew, other consulting fees, some national consulting fees and franchise fees.[14] Kelley did not recall reviewing this draft balance sheet and profit and loss statement. (Tr. at 208.)[15]

During its first year of operations, KMK attempted to expand its business. In May

| 1110 | 08/29/97 | $ 4,000.00 |
| --- | --- | --- |
| | | $16,000.00 Total |

13. The checks from KMK to Colony Holdings in September 1997 were as follows:

| Check Number | Date | Amount |
| --- | --- | --- |
| 1111 | 09/02/97 | $ 1,000.00 |
| 1112 | 09/05/97 | $ 1,000.00 |
| 1113 | 09/08/97 | $ 2,000.00 |
| 1114 | 09/10/97 | $ 250.00 |
| 1115 | 09/11/97 | $ 500.00 |
| 1116 | 09/15/97 | $ 1,000.00 |
| 1117 | 09/17/97 | $ 1,000.00 |
| 1118 | 09/19/97 | $ 1,000.00 |
| 1119 | 09/24/97 | $ 1,500.00 |
| 1120 | 09/29/97 | $ 5,000.00 |
| | | $14,250.00 |

14. Counsel for McKnew extensively examined Kidd as to his understanding of what the "Consulting—Other" figure constituted. He ultimately concluded that "I remember a very high figure on a year-end document, which I questioned, for either consulting or management and was told that both national and . . . some of the payroll was included in that figure." (Tr. at 79.)

15. Kidd testified that Kelley had received this draft balance sheet and profit and loss statement. (Tr. at 79.)

1998, KMK obtained a line of credit from Cenit Bank, which provided up to $350,000.00 to fund the purchase of commission receivables. In November 1997, KMK, while still not profitable, increased its volume more rapidly in the Hampton Roads area than the *pro formas* from the national franchiser suggested would occur. (Tr. at 202–03.) McKnew approached Kelley about possibly expanding the business into Atlanta. Because of the substantial overhead structure then in place at KMK, expansion with the possibility of additional business volume appealed to both McKnew and Kelley, and KMK began business operations in Atlanta in April 1998. (Tr. at 204.)

Kelley funded $50,000.00 in additional capital to support the new Atlanta operations, with the agreement Kidd and McKnew would together fund an additional $50,000.00 for this branch.[16] Kelley allocated this $50,000.00 capital contribution for use only in connection with the Atlanta operations and not for use by McKnew for payment of salary. (Tr. at 199.) In June 1998, KMK assumed operations of a "Commission Express" franchise in Maryland. KMK envisioned this Maryland expansion would require little additional capital as the company could process the commissions purchased in Maryland by utilizing its facility and personnel in Hampton Roads without the necessity of having an employee located in Maryland.

Concerns about the liquidity of KMK provoked an exchange of memoranda between Kelley and McKnew in June 1998. McKnew wrote Kelley on June 9, 1998, advising he believed $25,000.00 in additional funds was necessary. Paragraph 4 of the memoranda admitted that "[c]urrently we [KMK] stretch the payment of accounts to the max." (Pls.Ex. 102a.) Kelley responded by memoranda on June 12, 1998, advising Diversified had placed another $5,000.00 in KMK's capital account and that Kelley would try to free up another $16,000.00, which would bring the loan from Diversified to KMK to a total of $100,000.00. Kelley expressed concern that the availability of $100,000.00 in combination with the monies available under the line of credit from Cenit was sufficient to fund the factoring needs of KMK. Kelley advised he believed "[t]he problem seems to lie in the use of the factoring capital for other purposes." (Pls.Ex. 102b.) Kelley reiterated McKnew may not use the monies borrowed from Diversified to pay vendors.[17] Kelley also complained

---

**16.** Kidd and McKnew never funded their agreed $50,000.00 capital contribution for the Atlanta operations.

**17.** Kelley expressed his concerns as to use of monies borrowed from Diversified as follows:

Item number 4 of your memo seems to suggest that the loans from Diversified and other sources may be tapped to pay vendors. As you know, this is an area of great concern to me. To the extent I have misunderstood what you are saying, I apologize. Nevertheless, it is probably useful to explain the logic underlying my concern and discuss the related issue of the company's current financial position,

The factoring capital loan to KMK by CENIT, Tom Carr and Diversified simply cannot be used to pay operating expenses.

I have guaranteed the CENIT loan, am about to guarantee the Tom Carr remainder in Hampton Roads and would be morally obligated to repay Diversified if KMK is unable to do so. I must be comfortable with these risks. I am not comfortable unless the money to repay these loans is available from a combination of the capital account at CENIT and liquidation of the receivables KMK has purchased. If we had to shut down the business, we could take the cash paid to KMK as deals close and use it to pay off all lenders in full. We should even have a little excess since the amount KMK is to be paid at closing is, on average, 10% greater than the amount we advanced (assuming no holdbacks). The actual percentage is probably greater when holdbacks are considered. Jennifer, Bob

of the lack of recent financial information concerning KMK.[18] Then Kelley acknowledged he and Mrs. Kelley had invested at that point approximately $188,000.00 in KMK, far exceeding the $125,000.00 originally contemplated.

McKnew responded to Kelley's memoranda on June 16, 1998 by electronic mail. (Pls.Ex. 103.) McKnew acknowledged financial and budget information was overdue and remained in progress. McKnew sought to reassure Kelley that KMK remained viable and "was approaching the point it can pay its bills from operating cash flow." McKnew acknowledged that Kelley had required the separation of venture capital and factoring capital and had expressed this restriction to McKnew in November 1997.[19] McKnew advised Kelley he had made every effort to honor Kelley's concern of limiting the factoring capital to fund purchases of commission receivables.[20] McKnew also expressed concern to Kelley that he continue McKnew's salary.[21]

and I would lose the venture capital we have invested, but that is the risk we took. I am unwilling to assume more risk than that.

Vendor bills must be paid from operating earnings or venture capital. I know that we are running a monthly deficit, but I am not sure how much the deficit is when we include all outstanding bills. What bills are past due? I want to be particularly certain that payroll and other taxes stay up to date. As a manager of KMK, I will be liable for any unpaid taxes.
(Pls.Ex. 102b.)

18. Concerning financial information, Kelley stated as follows:

It sounds like we cannot continue our current strategy of stalling on bills until the volume picks up to a sustainable level. We will have to either cut expenses severely and/or bring in another investor to cover the shortfalls. I do not know which is the correct course of action since we do not have a budget for 1998 or actual to budget monthly income statements. The importance of getting these statements done ASAP cannot be overstated. I hope we will have something no later than the end of the month.
(Pls.Ex. 102b.)

19. McKnew in his testimony at trial acknowledged he represented to Kelley in the June 16, 1998 e-mail, he would honor Kelley's request to separate venture capital and funding capital. (Tr. at 335.)

20. The full text of the electronic mail sent by McKnew to Kelley as it concerns separation of factoring capital provides as follows:

I know you have deep concern over the separation of Venture Capital and Factoring Capital. You expressed this to me clearly back in about November on the occasion of a capital call. As I explained at that time, prior to your expressed concern we were following the business model we acquired from CE National. This does not specifically restrict the uses of capital but provides the specific means to track the use of funds. Since then, I have made every effort to honor your concern...hence the requirement for additional capital. Clearly, I will need to address this more closely with you because this remains a major concern of yours. As your memo states, you want this separation of capital done on a cash basis, without exception. To do so, I agree with you, Bob and I will need to fund our $50,000.00 and we will most likely need an additional investor. *Our books are maintained on an accrual basis.* The actual cash receipt of gross income is much more sporadic than monthly obligations allow...particularly considering our service center concept, aggressive marketing and expansion efforts. Again, this was the reason for Venture Capital. With this restriction, it may be the reason for additional venture capital. We will review the reality of this over the numbers. And remember, I personally guaranteed Diversified and Carr also.
(Pls.Ex.103.)

21. McKnew wrote:

One matter I feel lurking is the matter of compensation to Colony Holdings, aka me. Although you are kind enough not to mention it, maintaining this is naturally of great concern to me. I do what I can do with regard to irregularity of income, but, obvi-

Finalizing the organizational documents for KMK dragged on for many months. Kelley had prepared an outline of a proposed operating agreement for KMK in July 1997. (Def.Ex. G.) Kenneth Tillou, Kelley's law partner, prepared a draft operating agreement for KMK shortly thereafter. (Def.Ex. H.) Attached as an exhibit to the draft Operating Agreement was a draft Employment Agreement between KMK and McKnew. (Def.Ex. I.) This draft left the provisions for base salary incomplete. Kelley referred McKnew to Charles McPhilips, a local attorney, to represent his interests in completion of the organizational documents of KMK. Completion of the Operating Agreement continued to languish, with Tillou issuing another draft in March 1998. (Def.Ex. AE.) He followed that agreement by another draft in mid-April 1998. *Id.* Then on April 14, 1998, Kelley, Mrs. Kelley, Kidd, McKnew, and McKnew's wife, executed an Operating Agreement. (Def.Ex. AF.) Despite listing an Employment Agreement as an exhibit to the executed Operating Agreement, there was no Employment Agreement appended thereto. Negotiations between Kelley and McKnew continued, and apparently they decided to shift from an employment agreement to a management agreement. On May 27, 1998, Tillou forwarded to Mr. Phillips for his review a draft Management Agreement. The draft provided for a base fee from July 1, 1998–December 31, 1998 of $100,000.00 annually. (Def.Ex.

AH.) [22] Kelley stated these numbers inserted in the draft Management Agreement originated from Tillou and were not correct. No written employment or management agreement between KMK and McKnew was ever finalized or executed.

Financial information concerning the performance of KMK after the initial months of operations was scarce. Additionally, KMK had problems with its accounting software. Kelley discussed the lack of accurate financial information concerning KMK with McKnew while in Atlanta in late March or early April 1998. (Tr. at 368.) Kidd transmitted a memorandum to Kelley on August 31, 1998, expressing the need for a meeting concerning the financial status and projections of KMK. (Def.Ex. AX.)

In August 1998, Mark Pushinski, then a graduate student at the College of William and Mary and a consultant to KMK, prepared a financial document for the purpose of budgeting and forecasting KMK's profit centers. (Tr. at 315.) Entitled "Combined Operation Actuals as of July '98 Versus Projected Yearly Totals," Pushinski prepared the document with input from McKnew and Kelley. Among the expense entries was a figure of $12,500.00 each month for payments to Colony Holdings. (Def.Ex. AV.) A meeting of Kelley, Kidd and McKnew ensued to discuss this long awaited financial information. McKnew in explanation of this entry, told Kidd that

---

ously I am ultimately dependent upon this business. This also was the reason for Venture Capital and this also feeds my veracious interest in pursuing volume to eliminate this dependence. Surely we will re-

view the reality of this over the numbers. So far I greatly appreciate your respect for what this money is buying KMK. (Pls.Ex.103.)

**22.** The draft also provided for the following base fees:

| January 1, 1999–December 31, 1999 | $120,000.00 |
| January 1, 2000–December 31, 2000 | $140,000.00 |
| Any later year | $140,000.00 or such other amount As is mutually agreed to in Writing. |

this money "had not been paid to Colony Holdings" and ". . . was just a projection he was making." (Tr. at 358.) Kelley also testified Kidd raised the issue that this document showed compensation to Colony Holdings at $12,500 per month and that "we were assured by Mr. McKnew that this was the amount that was being accrued, quote—unquote, and was not actually being taken." (Tr. at 369.) The document also contained a series of entries under "Total Operating Expenses" called "Unallocated." Apparently, the "unallocated" entries, when added to the listed amount paid to Colony Holdings of $12,500.00 each month, approximated the actual amounts of monies removed from KMK and paid to McKnew via Colony Holdings. (Tr. at 316.) McKnew never indicated to Kelley or Kidd that the amount shown as paid to Colony Holdings plus the "Unallocated" entries equaled the actual amount of money McKnew and Colony Holdings received from KMK. (Tr. at 359.)

During the summer of 1998, capital for KMK remained scarce. McKnew on August 16, 1998, sent an electronic mail to Kelley advising he needed more factoring capital for the Virginia and Maryland operations, with only $18,000.00 remaining available under the Cenit line of credit.

The revelation of financial information from KMK's certified public accountant in late September 1998 generated a crisis between Kidd, Kelley and McKnew. On September 21, 1998, Kelley received a call from Pat Corbin, who was KMK's outside accountant ("Corbin"). Corbin began by asking Kelley if he realized McKnew had taken well over a hundred thousand dollars out of KMK in 1998. Kelley responded that Corbin was mistaken because McKnew was not allowed to take any money out of KMK, as KMK had exhausted the venture capital and it was not generat-

ing sufficient earnings to pay any substantial amounts. (Tr. at 175.) Corbin advised he had pulled additional information that was not on the face of the financial statements and that he could prove his assertion. (Tr. at 177.) Corbin then forwarded to Kelley by facsimile transmission a "KMK–HR–Commission Express Balance Sheet as of June 30, 1998." Under the entry "Professional Fees," the balance sheet showed an entry for "consulting-other" of $130,050.00. Attached to the balance sheet, he detailed on a month-by-month basis for January 1998 through July 1998 the fees included under "consulting-other" on the balance sheet. After deduction of certain fees paid to other consultants, his analysis showed Colony Holdings had received $118,450.00 for the first six months of 1998. (Def.Ex. BC.) After reviewing these documents, Kelley called Corbin and arranged a meeting for the next morning. (Tr. at 179.) Kelley also faxed Corbin's analysis to Kidd. *Id.*

Kelley, Mrs. Kelley, and Corbin, met on the morning of September 22, 1998. *Id.* Corbin urged that they investigate the affairs of KMK to ascertain the status of the monies coming into KMK. Corbin also advised that they cease McKnew's check writing authority at KMK. Immediately after this meeting, Kelley and Mrs. Kelley adjourned to Cenit Bank where KMK maintained its bank accounts and executed new signature cards, removing McKnew as an authorized signatory on all KMK accounts. (Tr. at 180.)

On September 23, 1998, McKnew and Kelley met to discuss the withdrawals of monies by McKnew from KMK. The staff of KMK was notified McKnew no longer had check writing authority and that an audit of the finances would occur. Apparently, some subsequent conversations took place between McKnew and Kelley, which McKnew followed with a memorandum

transmitted to Kelley via facsimile on September 25, 1998 ("September 25 Memorandum"). In the September 25 Memorandum, McKnew admitted "excess pay-ments" to Colony Holdings had occurred and that he had failed "to act in a timely and appropriate manner." (Pls.Ex. 126.) McKnew then succinctly stated, "I was wrong. I am sorry." *Id.*[23] In preparation

**23.** Because of the admissions of McKnew contained in the September 25 Memorandum, the text is reproduced below in its entirety:

> Following-up on our meeting of the 23rd, and subsequent conversations, I offer the following for your consideration:
>
> I Please accept my statement on why this matter exists:
>
> The convergence of:
>
> 1. The requirement to separate equity and investment capital imposed after several months of operation; deviating from CEN's model on borrowing from investment capital to fund equity requirements.
>
> 2. The ever-growing recognition, attention and cost required to mold what KMK purchased from CEN into a workable and profitable business. This includes dealing with CEN, development of the Customer Service Center concept and the work to obtain the volume in new markets to take advantage of it.
>
> 3. Uncertainty as to the need for, return on, and limitations on the availability and willingness to invest capital to address (1) and (2).
>
> 4. My failure to act in a timely and appropriate manner.
>
> 5. My personal over optimism.
>
> 6. My personal financial condition in existence before KMK was formed.
>
> I created all aspects of this untenable situation. I failed to act properly to deal with all matters in a timely, responsible and business-like manner. I was wrong. I am sorry.
>
> I am capable of and trustworthy to handle all day-to-day and financial matters of KMK. I have not shown this with regard to financial matters as evidenced by the current situation. I must re-earn your belief in my capabilities in this regard. I am doing a good job refining what KMK purchased from CEN and continue to strive daily to position KMK well to take advantage of all of our efforts. I have led the development of and continue to improve on the foundation that exists to create a quality and efficient operation that will lead KMK to sustained profitability. I know we are headed in the right direction with this business. I very much want to continue to lead the effort to make this happen.
>
> II. To address this, I respectfully request your consideration of developing the following into a workable plan. I believe doing so will be in the best interests of all.
>
> ● I will provide the number for gross expenses on Monday with detail shortly thereafter. With that complete, we will agree on the amount of excess payments to Colony Holdings.
>
> ● I will compensate KMK and you in a mutually workable and acceptable plan to recover the excess payments made to Colony Holdings and any cost and return required to obtain them.
>
> ● You may dictate how the financial matters of KMK will be operated to assure their unquestionable integrity to your complete satisfaction. I have suggestions on this that should not be burdensome or costly to KMK or you. Complete and timely financial reporting shall be prepared internally on a monthly basis and reviewed externally quarterly, on both a cash and accrual basis, to include, Profit and Loss Statements, Balance Sheet and Budget vs. Actual (the ability to do this is almost complete for September).
>
> ● You will fund deficits to KMK to allow KMK to operate on a cash basis.
>
> ● Supporting and without conflicting with all of the above, I will continue with direct responsibility to further the business interests of KMK to include: Operations, underwriting, planning, marketing and reporting.
>
> ● You will consider implementing a salary structure for me that will allow me to meet monthly obligations and create an incentive plan beneficial to the interests of KMK. We will finish the documentation necessary to put this in place.
>
> ● I will seek to expand KMK's business territory, directly or indirectly, and enhance business methods to increase short-term income and expand profit potential. You will support this effort by assisting with bringing-in additional capital, if required.
>
> I will see you Monday at 9:00 am. Thank you for your interest, efforts and consideration.

of the September 25 Memoranda, McKnew made handwritten notes, which also acknowledged the excess payments to Colony Holdings and his regret over such payments. (Pls.Ex. 153.) [24]

On September 28, 1998, Kidd, Kelley and McKnew, met and discussed the McKnew money withdrawals and the circumstances under which KMK could continue in business. Kelley advised McKnew that at least $150,000.00 had to be returned by McKnew to KMK. (Def.Ex. BI.) Kelley further advised McKnew he would have to sign a note evidencing his withdrawals and secure it with a deed of trust on McKnew's residence in Williamsburg. McKnew responded that he had talked to his wife, and they would do what they needed to do. Kelley then advised McKnew he could no longer handle the money at KMK, to which McKnew responded he could not imagine Kelley having it any other way. *Id.* Much of this meeting's discussion concerned speculation as to how KMK could minimize expenses to continue in business, including decreasing McKnew's salary.[25] For the purpose of reducing the amount of repayment to KMK, McKnew asked Kelley if he would acknowledge that McKnew had been entitled to withdraw $12,500.00 each month. Kelley responded negatively.[26] *Id.* McKnew at one point acknowledged his

cash withdrawals had precipitated the financial crisis at KMK, stating that if he had taken nothing, "we'd be ok." *Id.*

Kidd and Kelley had discussed a number of options regarding McKnew's status. Kidd did not wish to fire McKnew until he and Kelley "came up with a plan for hiring someone else and digging out." (Tr. at 68.) Kelley initially wanted to fire McKnew, but Kidd persuaded Kelley that KMK needed McKnew to continue until the financial situation stabilized. (Tr. at 191.) Kidd and Kelley agreed that Mrs. Kelley would examine the books and records of KMK to attempt to determine how much money McKnew had withdrawn. (Tr. at 193.)

Apparently, at no time during the September 28, 1998 meeting did McKnew advance his current position that his agreement with Kidd and Kelley permitted him to withdraw from KMK such monies as his financial needs required. (Def. Ex. BI; Tr. at 61.) Rather, McKnew acknowledged on a number of occasions that his withdrawal of monies from KMK was wrongful.[27] Kelley memorialized the conclusions from the September 28 meeting in a memorandum of the same date, which he copied to McKnew, Mrs. Kelley and Kidd. This memorandum indicated McKnew and

---

(Pls.Ex.126.)

**24.** McKnew's handwritten notes used in preparation of the September 25 Memoranda provide, in pertinent part, as follows:

"-Invalidate all you both know of me."
"-I acknowledge overage; am sorry and will repay w/plan."
"Mort to carry payments."

**25.** Kidd's notes reflect Kelley stating McKnew could withdraw $8,333.00 per month and after repayment by McKnew, they would have to figure out what KMK could pay him, which was unlikely to equal more than $5,000.00 per month. (Def.Ex.BI.)

**26.** Kidd's notes as to this exchange between McKnew and Kelley are as follows:

"Bill Will you acknowledge the $12,500?"
"Walt No—the 12,500 was only from cashflow."

**27.** Kidd's testimony on this point is as follows:

"Q. In your meetings and discussions with Mr. McKnew, did he say or acknowledge that the money he took was wrongful?
A. Yes.
Q. How many times?
A. A dozen, 15."
(Tr. at 61.)

his wife would sign a note to KMK in the amount of $150,000.00, secured by a second deed of trust on their residence, and that McKnew would immediately attempt to sell their residence. (Def.Ex. BJ.) On September 30, 1998, Kelley forwarded to McKnew for his execution the note and deed of trust described in the September 28, 1998 memorandum. Neither McKnew nor his wife ever executed the note or the deed of trust. (Tr. at 161.)

Kelley on October 12, 1998 promulgated a memorandum to McKnew, Kidd and Mrs. Kelley, which confirmed the setup of an October 16, 1998 meeting to attempt to "reach agreement on the amount of money that Bill [McKnew] must repay to the company." (Pls.Ex. 135.) Kelley asserted in the October 12 memorandum that a total of $331,573.79 was paid between June 1997 and September 1998, while McKnew was to have been paid $163,753.00 during the same period of time. *Id.* Kelley went on to note "the payment of Bill's [McKnew] salary was conditioned upon the availability of cash either through venture capital or earnings (*i.e.*, not from borrowed funds)." *Id.* Kelley attached documentation delineating his analysis of the injection and exhaustion of venture capital of KMK. A chart illustrated the venture capital contribution of Kelley and Kidd, which, exclusive of the $50,000.00 contributed by Kelley for the Atlanta operations in April 1998, totaled $183,350.38.[28] *Id.* Kelley calculated that operating expenses and monies paid to McKnew via Colony Holdings exhausted the total venture capital and cash earnings of KMK by the end of November 1997. *Id.*[29]

McKnew responded by memorandum on October 13, 1998. (Pls. Ex. 137.) McKnew asserted that "the actual amount of the *venture capital commitment was not pre-established.*" *Id.* McKnew also stated "[t]he concept of compensation to Colony Holdings being paid only from venture capital or earnings was one you recently introduced ... in connection with the yet to be resolved and executed management agreement for Colony Holdings." *Id.* After restating "my continuing acknowledgment and deep regret regarding the overpayment to Colony Holdings," McKnew asserted the problem "*is and was volume.*" *Id.* McKnew annotated Kelley's computations in the October 12 Memorandum and deducted undetailed "expenses and direct payments" to reduce the total payments to Colony Holdings to $267,551.41. *Id.* McKnew also amended Kelley's summary of venture capital ex-

---

28. The venture capital contributions for Kelley were $20,000.00 in June 1997, $47,000.00 in July 1997, $50,000.00 in August 1998, $61,350.38 in December 1997 and $5,000.00 in January 1998. (Pls.Ex. 135.)

29. Kelley calculated his assertion of venture capital exhaustion by beginning with the balance of all venture capital (excluding the monies injected in April 1998 for Atlanta operations) of $183,350.38. He added to this number the 1997 cash earnings of KMK of $16,456.35. Then he subtracted $121,719.02 in operating expenses and $153,123.79 paid to McKnew via Colony Holdings in 1997. (Pls.Ex. 135.) Page 3 of the October 12 memorandum, which summarizes Kelley's analysis of the 1997 venture capital exhaustion, appears to incorrectly state that venture capital totaled $183,350.38, excluding Kidd's venture capital contribution of $10,000.00 in June 1997. Kelley's summary of 1997 venture capital exhaustion appears to contain an arithmatic error. Kelley understates the negative capital of KMK in 1997 at $31,404.77, when it appears the negative capital, based on his numbers for venture capital, 1997 cash earnings, expenses and payments to Colony Holdings was $75,036.08 ($183,350.38 + $16,456.35 − $121,719.01 − $153,123.79 = $75,036.08). Even though the page 4 of the Memorandum listed the Venture Capital as $193,350.38, it appears Kelley used the more prevalent $183,350.38 in his calculations.

haustion in the October 12 Memorandum by the reduction in 1997 amounts paid to Colony Holdings from $153,123.79 to $95,604.52. *Id.* McKnew, however, seems to agree that by the end of 1997, KMK had exhausted both its venture capital and cash earnings.[30]

There was an exhaustive review of the financial records of KMK undertaken in the fall of 1998, conducted primarily by Mrs. Kelley. (Tr. at 90.) This review scrutinized all of McKnew's withdrawals and all items purchased by McKnew with KMK funds since the inception of the business. McKnew had an opportunity to supply information to support any legitimate business expenses for which KMK could have reimbursed him. (Tr. at 94–95.) He supplied this information to Mrs. Kelley in substantial detail. Mrs. Kelley requested, and McKnew provided, access to his personal bank account records so an analysis could be attempted as to what purposes McKnew expended the monies withdrawn from KMK. (Tr. at 90–91.)

The results of Mrs. Kelley's investigation showed McKnew withdrew substantially more than $10,000.00 every month from July 1997 through September 1998.[31] Apparently, McKnew for the most part does not dispute these withdrawals, which total $292,906.76 for sixteen months. (Tr. at 116–17.)[32] These withdrawals average $18,306.67 per month. Mrs. Kelley's examination of McKnew's expense reimbursement records produced $7,410.38 in legitimate expenses for which KMK could reimburse McKnew. Mrs. Kelley's examination also uncovered $6,083.29 worth of personal items, which Kidd and Kelley believe McKnew improperly paid for with company monies; McKnew disputes certain of these items.[33] Based upon Kelley's position that there was no more venture capital in KMK at the end of 1997, and therefore McKnew had no salary entitlement in 1998, KMK asserts McKnew withdrew $225,606.67 more in compensation than he was permitted under the agreement between Kidd, Kelley and McKnew. This number, when combined with $7,410.38 in un-reimbursed expenses, which KMK agrees were proper, and the $6,083.29 in personal items McKnew purchased with KMK funds, equal the total amount claimed by KMK against McKnew

---

30. McKnew asserts in his October 13 Memorandum that KMK had negative capital and earnings of $17,516.81 at the end of 1997. (Pls.Ex. 137.)

31. The payments made to Colony Holdings from KMK month by month are as follows:

| June | 1997 | $ 8,725.89 |
|---|---|---|
| July | 1997 | $ 21,480.87 |
| August | 1997 | $ 16,000.00 |
| September | 1997 | $ 14,250.00 |
| October | 1997 | $ 19,500.00 |
| November | 1997 | $ 21,000.00 |
| December | 1997 | $ 13,500.00 |
| January | 1998 | $ 19,750.00 |
| February | 1998 | $ 17,500.00 |
| March | 1998 | $ 25,000.00 |
| April | 1998 | $ 22,000.00 |
| May | 1998 | $ 14,700.00 |
| June | 1998 | $ 19,500.00 |
| July | 1998 | $ 22,000.00 |
| August | 1998 | $ 17,500.00 |
| September | 1998 | $ 20,500.00 |
| | Total | $292,906.76 |

(Pls. Ex.3; Tr. at 117–20.)

32. McKnew testified that approximately $284,000.00 was withdrawn from KMK to Colony Holdings and McKnew, indicating that "[m]y adjustments to that [$294,000]—some are accounting errors that he made, and some are continuing disagreements—is about $284,000." (Tr. at 307.) McKnew never provided any specifics concerning these alleged accounting errors or "disagreements."

33. McKnew disputed certain items such as the long distance telephone service at his residence.

of $224,279.58.[34] Mrs. Kelley also obtained access to McKnew's bank account and the account of Colony Holdings to attempt to trace the usage of the monies withdrawn by McKnew from KMK. (Tr. at 90–91.) Mrs. Kelley's investigation revealed that each deposit of a KMK check into Colony Holdings bank account was immediately followed by McKnew drawing a check in an amount identical to the KMK check. He then deposited the Colony Holdings check into his personal account. (Tr. at 92.) McKnew used the transferred monies for his personal benefit, including paying a variety of expenses such as tuition for his children and country club dues. (Tr. at 47.)

KMK's financial condition in September 1998 was grave. The discovery of the removal of monies by McKnew provoked Kelley to inquire into KMK's overall finances. Kelley's investigation into the financial affairs of KMK revealed that KMK did not have sufficient monies to make its payroll that was to come due at the end of September. (Tr. at 367.) Kelley's inquiries also revealed KMK was substantially over advanced on its line of credit at Cenit Bank, which prevented any additional borrowings on the line of credit. *Id.* Kelley had to infuse sufficient monies to repay the Cenit line of credit to remain within its terms and conditions[35] and to make pay-

**34.**

| Month | Monies Paid to McKnew | Less Credit For Legitimate Business Expenses | Personal Items Paid for With Company Funds | Total |
|---|---|---|---|---|
| June, 1997 | $ 1,614.00 | $ (351.12) | $ 278.81 | $ (1,686.31) |
| July, 1997 | 11,480.87 | (29.60) | | 11,451.27 |
| August, 1997 | 6,000.00 | (141.03) | 914.62 | 6,773.59 |
| September, 1997 | 4,250.00 | (202.18) | 1,265.75 | 5,313.57 |
| October, 1997 | 12,539.80 | (202.75) | 58.89 | 12,395.94 |
| November, 1997 | 11,000.00 | (557.12) | 321.95 | 10,764.83 |
| December, 1997 | 3,500.00 | (5.07) | 483.66 | 3,978.59 |
| January, 1998 | 19,750.00 | (533.17) | 465.58 | 19,682.41 |
| February, 1998 | 17,500.00 | (658.98) | 93.83 | 16,934.85 |
| March, 1998 | 25,000.00 | (1,071.03) | 162.29 | 24,091.26 |
| April, 1998 | 22,000.00 | (732.63) | 208.54 | 21,475.91 |
| May, 1998 | 14,700.00 | (830.12) | 348.47 | 14,218.35 |
| June, 1998 | 19,500.00 | (78.11) | 221.31 | 19,643.20 |
| July, 1998 | 22,000.00 | (950.39) | 242.39 | 21,292.00 |
| August, 1998 | 17,500.00 | (550.49) | 504.19 | 17,453.70 |
| September, 1998 | 20,500.00 | (516.59) | 279.90 | 20,263.31 |
| October, 1998 | | | 60.90 | 60.90 |
| November, 1998 | | | 23.13 | 23.13 |
| December, 1998 | | | 7.87 | 7.87 |
| January, 1999 | | | 25.78 | 25.78 |
| February, 1999 | | | 58.06 | 58.06 |
| March, 1999 | | | 48.66 | 48.66 |
| April, 1999 | | | 8.71 | 8.71 |
| Totals | $225,606.67 | $ (7,410.38) | $6,083.29 | $224,279.58 |

(Pls.Ex. 1.)

**35.** Kelley infused either $112,000.00 or $125,000.00 to repay the amount of the Cenit line of credit necessary to eliminate the out of trust position.

roll. *Id.* Because KMK could no longer borrow on the Cenit line of credit, Kelley also arranged for a loan from a trust controlled by his mother in the amount of $175,000.00 to repay Cenit and provide sufficient funds to allow KMK to purchase receivables. *Id.*

With these cash infusions by Kelley and his family, KMK continued in business during the fall of 1998, with McKnew not drawing any compensation from KMK after September 1998. Efforts to reconcile the amount owed by McKnew continued into December 1998. On December 8, 1998 Kelley transmitted to McKnew via facsimile a memorandum outlining the terms upon which Kelley and Kidd would permit McKnew to continue at KMK. (Def.Ex. BV.) Under this term sheet, McKnew would receive "$5,000 per month, in arrears, until the later of: (1) equilibrium of loans vs. cash/purchase price of receivables; or (2) McKnew debt paid in full." *Id.* He would receive this salary only if there were sufficient cash earnings from the prior month to cover it and the salary of Mrs. Kelley, who was now working at KMK. McKnew was to execute a promissory note in the agreed amount of his debt secured by a second deed of trust on his residence, which McKnew would agree to sell within six months. McKnew would continue to have no check writing authority at KMK.

McKnew responded on December 9, 1998, requesting a monthly salary of $6,000.00 and an indebtedness owed by McKnew to KMK of $100,000.00, reduced to $70,000.00 on January 31, 1999 as a result of McKnew receiving no compensation in October, November, December and (presumably) January 1999. (Def.Ex. BX.) He would also execute a promissory note without any collateral. However, no meeting of the minds occurred between Kelley, Kidd and McKnew, and KMK discharged

McKnew on December 10, 1998. (Tr. at 353.)

Subsequent to McKnew's discharge, in March 1999, Kelley, on behalf of KMK, stated McKnew owed them $117,333.04. (Def.Ex. CB.) McKnew has never paid any amount to KMK. Thereafter, Diversified filed a motion for judgment against McKnew by reason of his guaranty of the monies borrowed by KMK from Diversified, and he ultimately obtained judgment on the guaranty. (Def.Ex. CL.)

On July 6, 2000, McKnew filed for relief pursuant to Chapter 13 of the Bankruptcy Code in this Court. McKnew converted his case to a proceeding under Chapter 7 on October 24, 2000. Thereafter, KMK and Diversified filed the instant Complaint to Determine Dischargeability of Debts. In the Complaint, KMK states "[a]s part of the deal that was negotiated between Defendant [McKnew] and the Outside Investors, the parties agreed that the Defendant would receive 'conditional compensation' of $10,000.00 per month during calendar year 1997 and $12,732.22 per month during calendar year 1998." (Compl.¶ 9.) The Complaint further alleges that, by December 31, 1997, KMK had exhausted the start-up capital invested by Kelley and Kidd. This situation, in conjunction with KMK running cash deficits each month, precluded McKnew from properly receiving any compensation. The Complaint goes on to allege McKnew took additional monies from KMK and concealed his conduct, as well as utilized KMK funds to purchase personal items. KMK alleges McKnew's debt to it is not dischargeable because he (i) obtained the excess monies paid to Colony Holdings by false pretenses, false representations and actual fraud pursuant to § 523(a)(2) of the Bankruptcy Code; (ii) as a manager and operator of KMK, McKnew was a fiduciary of KMK and the excess monies paid to Colony Holdings consti-

tutes conversion which is not dischargeable pursuant to § 523(a)(4); and (iii) McKnew's removals of excess monies were wrongful acts done with the intent to cause injury to KMK and are not dischargeable pursuant to 11 U.S.C. § 523(a)(6).

Diversified alleges McKnew obtained money from it by false pretenses, false representations or actual fraud barring discharge under § 523(a)(2) and that the indebtedness of Diversified is not dischargeable pursuant to § 523(a)(6) because McKnew committed wrongful acts which were done with the intent to cause injury to Diversified and without just cause or excuse.

McKnew defends these allegations by answering that McKnew and Kelley had an agreement on compensation that "provided that the debtor [McKnew] could be paid to support the needs of his family as cash flow permitted" and that "he and Mr. Kelly (sic) had a verbal understanding that the Debtor's initial compensation would be in the range of $10,000.00 per month." (Answer ¶ 6.) McKnew denies any formal compensation arrangement with Kelley and further denies he ever admitted to paying himself monies in excess of the levels agreed.

The Complaint then largely turns upon two discreet factual issues; was there an agreement between McKnew, Kelley and Kidd, as to the amount of monies McKnew could remove from KMK via Colony Holdings as compensation for his service as co-manager of KMK; and, if there was an agreement, what were the specific terms limiting the compensation to McKnew? Kidd and Kelley assert that they and McKnew agreed to $10,000.00 of compensation each month for McKnew, which was only payable from venture capital and earnings of KMK. They cite to a number of documents reflecting this compensation level generated by McKnew in the early

tenure of this venture, which allegedly support their contention that there was such a binding limitation. KMK also directs the Court to these and later documents in which it believes McKnew was deceptive in concealing the true amount of compensation he received from KMK. Diversified believes McKnew acknowledged that KMK could only use the Diversified monies to purchase receivables; and that McKnew ignored this segregation, and thereby he used its monies in the operations of KMK, including payment of his compensation.

McKnew contends that there was no "formal" compensation agreement with Kelley and Kidd, and alleges his initial agreement with Kelley was McKnew could pay himself whatever his family's needs demanded so long as it did not impair the cash flow of the business. McKnew also contends he never concealed the amount of his compensation and that Kelley and Kidd had access to the books and records of KMK at all times.

Resolution of this factual contention largely drives the outcome of this case; if the Court believes Kidd and Kelley that there was an agreement to limit the compensation to McKnew, then any excess compensation paid to him via Colony Holdings is likely not dischargeable under the Bankruptcy Code. Conversely, if McKnew is believed that there was no compensation agreement and he could remove monies consistent with his financial needs subject only to cash flow, then any amounts paid to him by KMK were authorized and McKnew owes nothing to KMK. Similarly, if this Court believes there was a restriction placed upon usage of the monies lent by Diversified which McKnew acknowledged, then violation of that restriction would likely generate a conclusion the liability of McKnew for the indebtedness of KMK to Diversified guaranteed by

McKnew is not dischargeable. As the amounts paid to McKnew from KMK are largely undisputed[36] and it similarly appears conclusively established that McKnew used the monies loaned by Diversified to KMK for purposes other than the purchase of receivables, this Court's conclusions as to whether these agreements were in place concerning compensation to McKnew and use of Diversified's monies will dictate the ultimate outcome of this litigation.

In weighing the totality of the evidence at trial, this Court believes that McKnew, Kidd and Kelley agreed that McKnew's total compensation would be limited to $10,000.00 for the first year of operation of KMK and $10,417.00 for the second year of operation of KMK. In reaching this conclusion, the Court finds persuasive the testimony of Kidd, the testimony of Kelley, and the documentation prepared by McKnew in the early months of operation of KMK, which appears clearly to indicate McKnew understood his maximum compensation was $10,000.00 per month.

While it would be inaccurate to describe Kidd as disinterested in the dispute here, his financial interest in KMK is fractional compared to Kelley's. Kidd is resolute in his recollection that McKnew and Kelley agreed to the $10,000.00 per month maximum compensation. His continuing conviction that McKnew's $10,000 per month salary was excessive made Kidd sensitive to ensuring McKnew's compensation did not exceed this reluctantly accepted level and strengthens the credibility of his recollection. Kidd's testimony was unwavering that McKnew and Kelley had agreed to $10,000.00 per month prior to Kidd offering input as to the appropriate salary amount at the outset of KMK's operations.

Kelley's testimony is similarly resolute that he and McKnew agreed to compensation of $10,000.00 each month for 1997 and $10,417.00 for 1998.

McKnew's allegation that he and Kelley agreed McKnew could pay himself as much as his family needed to the extent that cash flow from KMK was available is simply not credible. It is not plausible to believe that two experienced and sophisticated businessmen such as Kelley and Kidd sanctioned a compensation arrangement in a start-up business where they supplied one hundred percent of the capital which would have, in essence, given McKnew a blank check to draw upon the treasury of KMK. Such an action, as Kelley aptly put it, "would have been insane." (Tr. at 186.) While it is now doubtless that Kidd and Kelley were overly trusting of McKnew because of their prior relationships with him, their affection for McKnew surely did not extend to the endorsement of the absurd compensation arrangement testified to by McKnew.

McKnew's writings and actions contemporaneous with the formation of KMK substantially undermines his "I can take whatever I need" theory of compensation. The *pro formas* prepared by McKnew unequivocally listed his compensation as manager as $10,000.00. His report of income and expenses of KMK to his investors shortly after commencement of operations enumerated his compensation as $10,000 per month, an amount consistent with the asserted agreement. McKnew's theory that he could remove any amounts of monies he needed seems to be an after-the-fact invention by McKnew to explain his abrogation of his agreement to limit his compensation to the $10,000 monthly amount, which

**36.** There apparently is a dispute of approximately $9,500 between what McKnew admits receiving and KMK's calculation. Despite testifying to the existence of this dispute, McKnew at trial never provided any details or specifics as to the disputed items.

abandonment commenced so very shortly after KMK commenced operation.

His concealment of the true amounts he withdrew from KMK, further discredits this theory. His report in September 1997 to Kelley and Kidd grossly misrepresented the amount of money he had already extracted from KMK within the first four months of operation. Later financial reports compiled from financial information supplied by McKnew were less than forthcoming in their disclosure of the compensation paid to McKnew, either including it in a general category such as all contractors or displaying a substantial portion of his compensation in a separate category designed to obfuscate such as "unallocated." [37]

McKnew's contention that the entirety of the issue between Kidd, Kelley and himself is merely a pay dispute likewise falls short of achieving credibility. It is true that, at times such as the September 28, 1998, meeting with Kidd, Kelley and McKnew, Kelley apparently misquoted the salary amount previously agreed to with McKnew. The Complaint filed here also misstates the salary amount agreed to for the second year. None of these missteps are sufficient to undermine the overwhelming conclusion emanating from the totality of the evidence that Kidd, Kelley and McKnew, at the outset of the formation of KMK agreed to a maximum compensation for McKnew of $10,000.00 each month for the first year, and he could only derive this salary from the venture capital contributed by Kelley and Kidd or from any earnings of KMK.

McKnew also attempts to ameliorate the evidence by arguing any agreement to limit his compensation to $10,000.00 per month was derivative of the early pro formas prepared by McKnew. McKnew asserts this business plan became obsolete by the unanticipated expansion of the business of KMK to Atlanta and Maryland, which consumed more capital than originally contemplated. The evidence contradicts this notion. First, it is clear Kelley over time contributed substantially more venture capital than the original *pro formas* assumed, including $50,00000 injected solely as working capital to finance expansion of KMK into the Atlanta market. Secondly, there is no evidence that McKnew ever approached Kelley and Kidd to modify their original $10,000.00 per month compensation agreement because of expansion of the business of KMK. While McKnew may have reached the unilateral conclusion that the increased scope of territory of KMK's business entitled him to greater compensation, there is simply no credible evidence that Kidd or Kelley ever considered, much less assented to, such increased compensation to McKnew. McKnew also discredits this theory by the uncontradicted evidence he limited his compensation to $10,000.00 per month only for the briefest time after commencement of operations of KMK; thereafter, he helped himself to substantially more monies well before any significant business expansion began.

McKnew's own writings immediately after discovery of his removal of substantial monies from KMK also sabotage his allegations. His contrition at the discovery of his excessive compensation withdrawals is

---

**37.** It is perhaps true that Kidd and Kelley by more exacting scrutiny of some of the minimal financial reports by KMK may have discovered earlier McKnew's removal of substantially more monies than the agreement allowed. However, their inability to detect it does not lessen McKnew's deceptive reporting. The fact that others may have unwound McKnew's efforts to hide his money extractions hardly negates McKnew's nefarious intent.

unmistakable. Nowhere in his memoranda is any suggestion of any ongoing salary dispute, nor is there the slightest notion that there existed any agreement McKnew could remove as much money as his needs dictated. Rather, McKnew's own words aptly described his remorse over the realization that his co-entrepreneurs now knew he improperly paid himself large amounts of money: "I was wrong. I am sorry." McKnew explains these admissions by stating they were not his concession of wrongdoing but merely his attempts to keep his job. McKnew's motivation to avoid termination from his lucrative employment is doubtless; his written words, however, speak for themselves in their acknowledgment of wrongdoing by McKnew.

The Court is similarly convinced Kelley required KMK to segregate any monies contributed by Diversified and limited these funds solely to the purchase of receivables and McKnew was cognizant of this prohibition at least by November 1997. McKnew acknowledged to Kelley as much in his memorandum dated June 16, 1998.[38] While he later attempts to suggest the segregation of capital was a new concept to him, the evidence is clear from McKnew's earlier written admission that he knew the capital contributed by Diversified was limited to purchasing receivables and not for other business operations, such as payment of his salary. This conclusion is additionally buttressed by McKnew's acknowledgment that the capital loaned to KMK by Tom Carr was so restricted, and Carr had such a provision in a loan agreement with KMK. McKnew's further explanation of the misusage of the Diversified monies that KMK could not segregate fi-

nancing capital because it always had insufficient working capital rings hollow. Kelley contributed substantially more venture capital to KMK than any original pro forma contemplated. Any absence of working capital appears directly the result of McKnew's generosity to himself, rather than insufficient contribution by Kelley.

The evidence that McKnew was aware of Kelley's requirement KMK only use the monies loaned by Diversified for the purchase of receivables, which McKnew failed to do, is persuasive. This compensation limitation also logically flows from the requirement, as this Court found McKnew agreed to by at least November 1997, that KMK could only use monies loaned to it for the purchase of receivables. After exhaustion of all venture capital contributed by Kidd and Kelley and any earnings of KMK, whenever that occurred, the sole apparent source of the payment of any expenses or obligations of KMK, including any otherwise authorized amounts to McKnew via Colony Holdings, was the restricted borrowings, whether from Diversified, Tom Carr or otherwise. To pay compensation to McKnew after exhaustion of venture capital and earnings, therefore, would by necessity run afoul of the financing capital restrictions. As such, restricting McKnew's compensation to the available venture capital and earnings is a logical corollary to restricting the use of monies borrowed to buy factored receivables to solely that purpose.[39]

Having determined these critical factual issues, it remains to apply the law as set

---

**38.** (Pls.Ex.103.)

**39.** McKnew's position that the restriction of payment of his compensation to amounts available from venture capital and earnings, is not logical, because it would result in him working for a substantial period of time with-

out compensation, ignores the fact McKnew had extracted more monies than permitted, depleting venture capital and earnings substantially sooner than would have otherwise occurred.

forth in §§ 523(a)(2), (4) and (6) of the Bankruptcy Code to decide whether the excess monies removed by McKnew from KMK via Colony Holdings and the monies owed by KMK to Diversified and guaranteed by McKnew are excepted from discharge.

## CONCLUSIONS OF LAW

One of the most important benefits of the bankruptcy code is its ability to offer a debtor a fresh start. This concept of a fresh start demands courts construe exceptions to discharge narrowly. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir.1999) (citing *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994)); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1016 (Bankr.N.D.Ill.1996) (citing *Mayer v. Spanel Int'l., Ltd.*, 51 F.3d 670, 674 (7th Cir.1995)). Courts balance this belief with the principle "perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)). The exceptions at issue in this case arise under § 523, which makes debts non-dischargeable:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to
>
> > the extent obtained by—
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition: . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) (2001). Under Bankruptcy Rule 4005, the plaintiff has the burden of proof to render a debt non-dischargeable. Under § 523(a), the plaintiff must prove non-dischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir.1994); *Combs v. Richardson*, 838 F.2d 112 (4th Cir.1988); *Whitson v. Middleton (In re Middleton)*, 100 B.R. 814, 818 (Bankr.E.D.Va.1988). Therefore, KMK and Diversified must prove by a preponderance of the evidence whether any of these provisions of § 523 apply to the case at issue.

### I. § 523(a)(2)(A)

### False Pretenses, False Representation Or Actual Fraud

The plaintiffs assert the defendant's debt is non-dischargeable as a debt from false pretenses, false representation, or actual fraud. As this Court has previously held, to make a debt non-dischargeable under § 523(a)(2)(A), the plaintiff must prove the following elements:

(1) That the debtor made a representation;

(2) That at the time the representation was made, the debtor knew the representation was false;

(3) That the debtor made the false representation with the intention of deceiving the creditor;

(4) That the creditor relied on such representation; and

(5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*Parker v. Grant (In re Grant)*, 237 B.R. 97, 112 (Bankr.E.D.Va.1999); *Fowler v. Garey (In re Garey)*, 258 B.R. 356, 361 (Bankr.E.D.Va.2000); *In re Heilman*, 241 B.R. 137 (Bankr.D.Md.1999); *Hecht's v. Valdes (In re Valdes)*, 188 B.R. 533, 535

(Bankr.D.Md.1995); *Clarkson v. Elibuyuk (In re Elibuyuk)*, 163 B.R. 75, 76 (Bankr. E.D.Va.1993).[40]

## A. Did McKnew Make a Representation?

■ Representations are either express or implied. "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.'" *National Bank of North America v. Newmark (In re Newmark)*, 20 B.R. 842, 854 (Bankr. E.D.N.Y.1982) (quoting *H.C. Prange Co. v. Schnore (In re Schnore)*, 13 B.R. 249, 251 (Bankr.W.D.Wis.1981)). As this Court held in *In re Grant*, 237 B.R. at 113, and *Household Fin. Corp. v. Kahler (In re Kahler)*, 187 B.R. 508, 512 (Bankr.E.D.Va. 1995), § 523(a)(2)(A) does not require any overt misrepresentation; this Court may imply such a misrepresentation from the debtor's silence.

The evidence here shows McKnew made a number of misrepresentations in connection with his compensation withdrawals. First, McKnew misrepresented to KMK through Kelley and Kidd the amount of his compensation by promulgating false and misleading financial information. McKnew shortly after the commencement of operations of KMK created the "CE/Tidewater–Income–Statement (cash) 6/1/97 through 9/9/97" report, which was distributed to Kelley and Kidd. This document, which McKnew supplemented by hand with later information, represented McKnew's compensation equaled the agreed amount of $10,000.00 per month. This representation was materially false, as the undisputed evidence shows McKnew almost immediately withdrew monies far in excess of the agreed compensation, receiving $20,456.76 more than the agreement allowed, during the time period accounted for in his initial financial reports to Kelley and Kidd.

Later, McKnew provided financial reports to Kelley and Kidd, which attempted to obscure and materially mislead by hiding McKnew's true compensation in an account category that combined all consultants expenses and, in a subsequent report, in a category designated as "Unallocated." McKnew made further misrepresentations to Kelley and Kidd when confronted by them to explain his compensation of $12,500.00 per month as provided in a financial report McKnew prepared. When asked why this amount was at variance with the agreed $10,000.00 per month compensation, McKnew misrepresented to Kelley and Kidd that the listed amount was for accrual accounting purposes only and did not represent the actual amount of compensation that he received. Meanwhile, McKnew withdrew more than his permitted compensation every month except for the very first month of operation of KMK, until the discovery of his misconduct in September 1998.

■ "Fraud and misrepresentation may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor." *Caldwell v. Hanes (In re Hanes)*, 214 B.R. 786, 809 (Bankr.E.D.Va.

---

**40.** As these cases illustrate and most recently *In re Biondo*, 180 F.3d 126 (4th Cir.1999) demonstrates, the Fourth Circuit analyzes § 523(a)(2)(A) by strictly focusing on misrepresentations. While the Seventh Circuit and the Sixth Circuit Bankruptcy Appellate Panel adopt a broader definition of § 523(a)(2)(A), such definition includes general tricks and deceit rather than only misrepresentations. *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873 (6th Cir. BAP 2001). Until the Fourth Circuit addresses this issue, this Court declines to expand the definition of fraud under § 523(a)(2)(A).

1997) (citing *O'Connor, CPO v. Booker (In re Booker)*, 165 B.R. 164 (Bankr.M.D.N.C. 1994)). As McKnew failed on many occasions to disclose his excess salary, these actions and representations constitute misrepresentations to KMK.

█ Furthermore, McKnew represented to Diversified he would only use its loan money as factoring capital. The evidence here clearly demonstrates Diversified specifically restricted these funds to their use as factoring capital and communicated this restriction to McKnew. "If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly." *Fensick v. Segala (In re Segala)*, 133 B.R. 261, 264 (Bankr.D.Mass.1991); *Marineau v. Slonim*, No. Civ. A. 94–047, 1994 WL 661143, at *2 (W.D.Va. Nov.10, 1994). However, the debtor did not use the funds for factoring capital but instead used them for other purposes not authorized by Diversified. Entrusting money to a debtor for a given purpose where the debtor has no intention of using the money for that purpose, constitutes a misrepresentation. *Miller v. Blagaich (In re Blagaich)*, 67 B.R. 375, 377 (Bankr.S.D.Fla.1986) (citing *In re Jones*, 50 B.R. 911 (Bankr.N.D.Tex. 1985)). *See also City Nat'l Bank of Fla. v. Sheridan (In re Sheridan)*, 57 F.3d 627, 634 (7th Cir.1995) (holding that "proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent"); *Leverage Leasing Corp. v. Reitz (In re Reitz)*, 69 B.R. 192, 196 (N.D.Ill.1986).

The evidence shows the venture capital funds contributed by Kelley and Kidd evaporated in December 1997. Given the nominal profits KMK enjoyed, it is apparent the Diversified monies were used for administrative expenses rather than exclusively for factoring capital to purchase commissions for KMK. Thus, McKnew's actions constitute misrepresentations to Diversified, and satisfy the first element of § 523(a)(2)(A).

## B. Did McKnew know the Representation was False?

To make a debt non-dischargeable, the plaintiffs must prove the debtor knew or should have known the representation was false when made. *Koma v. Brooks (In re Brooks)*, 4 B.R. 237, 238 (Bankr.S.D.Fla. 1980); *Berk v. Stewart (In re Stewart)*, 10 B.R. 214, 217 (Bankr.C.D.Cal.1981). KMK asserts that McKnew represented his salary as $10,000 per month. McKnew, Kelley, and Kidd, developed KMK's business plan based on a *pro forma*, which listed McKnew's salary as $10,000 per month. In addition to this *pro forma*, the debtor offered financial statements to Kidd and Kelley showing his salary at $10,000 per month.

However, he only limited his compensation to that amount in·the first month of operation. By the end of the second month of operation, he had already taken more than twice the agreed amount. This pattern continued throughout his tenure as manager of KMK, until he eventually took thousands more than his proper compensation.

He later admitted to Kidd he wrongfully took additional monies above $10,000. He stated in writing to Kelley with regard to the excess payments, "I was wrong. I am sorry." As his actions demonstrate from the outset of the operation of KMK, he never intended to only take his appointed salary; therefore, he knew his representations were false when made.

McKnew also knew his representations to Diversified were false when he made them. As the rapid consumption of the venture capital contributed by Kelley and

Kidd demonstrated, McKnew never intended to limit Diversified's monies to factoring capital. After the venture capital disappeared, the debtor continued to take money from the business for his compensation, even though KMK no longer had any venture capital. Given the profitability of KMK, McKnew was doubtless aware that no other monetary source existed to fund his compensation; therefore, he clearly took money from the factoring capital account without authority and with full knowledge of the restricted use of these monies. McKnew never evidenced any intention to restrict his use of the Diversified funds. *See Merchants Nat'l. Bank & Trust Co. v. Pappas (In re Pappas),* 661 F.2d 82, 86 (7th Cir.1981); *Cass v. Jones (In re Jones),* 50 B.R. 911, 921 (Bankr. N.D.Tex.1985) (holding "as evidenced by the acts of [the debtors] Ray and Twilla Jones, immediate and subsequent, there was no intention to use the Cass Money for such purpose"). Therefore, he knowingly made false representations to Diversified.

C. Did McKnew Intend to Deceive?

 "Because direct proof of intent (i.e. the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Universal Bank, N.A. v. Grause (In re Grause),* 245 B.R. 95, 99 (8th Cir. BAP 2000) (quoting *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1287 (8th Cir.1987)). *See also Marunaka Dainichi Co. Ltd. v Yamada (In re Yamada),* 197 B.R. 37 (Bankr.E.D.Va.1996); *Western Union Corp. v. Ketaner (In re Ketaner),* 154 B.R. 459, 465 (Bankr.E.D.Va.1992). This Court has held if the "debtor recklessly makes false representations that he should know will induce another to rely

thereon, intent to deceive may be inferred for purposes of § 523(a)(2)(A)." *In re Grant,* 237 B.R. at 115 (citing *In re Kahler,* 187 B.R. 508, 513 (Bankr.E.D.Va. 1995)).

McKnew asserts there was no fraudulent intent because a review by Kelley and Kidd of the financial records maintained by KMK would have permitted them to discover the amount of compensation he continued to remove. McKnew maintains his absence of *scienter* is shown by the fact he never prevented access to the checking account records of KMK. McKnew also maintains he had no fraudulent intent because his agreement with Kelley and Kidd permitted him to withdraw as much compensation as his family needs required.

The circumstances here provide ample proof of McKnew's fraudulent intent. First, McKnew's claim of an agreement to permit him to remove any amount needed to support his family is not supported by the evidence. Furthermore, McKnew's numerous attempts to hide his true amount of compensation received from Kelley and Kidd betray McKnew's fraudulent intent.

McKnew offered financial statements that only disclosed some of the checks paid to his personal account. McKnew paid for airline tickets via KMK checks and at the same time sought personal reimbursement for the checks. McKnew had his own personal long distance telephone calls from his home line paid for by the business. Every month save one, McKnew, until the discovery of his misconduct, took more money than the agreed amount. All of these acts of dishonesty and misrepresentation provide substantial circumstantial proof of McKnew's fraudulent intent.[41]

---

**41.** KMK's financial statements clearly show the debtor continued to take money from the

business even after the venture capital ran out and after the business ran into serious finan-

The evidence here also provides ample circumstantial proof that McKnew intended to deceive Diversified. The Court may infer intent to deceive from the surrounding circumstances. *In re Grant*, 237 B.R. at 115; *In re Yamada*, 197 B.R. at 39. McKnew acknowledged in writing, his knowledge of the restriction on the usage of the Diversified monies when he admitted that Kelley had required the separation of venture capital and factoring capital and had expressed this restriction to McKnew in November 1997. McKnew in the same writing advised Kelley he had made every effort to honor Kelley's concern over usage of factoring capital solely to fund purchase of commission receivables. McKnew's later suggestion, after discovery of his misconduct, that separation of factoring capital was a new concept recently introduced by Kelley is not credible. Despite McKnew's knowledge of the restriction on the Diversified monies, McKnew did not hesitate to continue to take money from KMK when the venture capital ran out, evidencing that he never intended to restrict his use of Diversified monies to factoring capital.

D. Did KMK and Diversified Justifiably Rely on the Representations?

■■■ The plaintiffs in this action must further prove they relied on the debtor's representations. The Supreme Court has held that a plaintiff must prove he justifiably relied on the debtor's representations in order to succeed under § 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 73–74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field*, 516 U.S. at 70, 116 S.Ct.

437. "A buyer's reliance on this factual representation [seller's statement the land is free of encumbrances] is justifiable, even if he could have 'walked across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage." *Id.* (quoting Restatement (Second) of Torts § 540 (1976) Illustration 1). This definition of reliance is not without limits; a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* at 70, 116 S.Ct. 437 (quoting Restatement (Second) of Torts § 541 (1976) Comment a).

■■■ McKnew maintains the plaintiffs could examine the financial records at any time and such an examination would clearly show the amount of compensation he received from KMK. Further, Kelley, who occupied key positions in both KMK and Diversified, was a sophisticated attorney who should have been able to ascertain McKnew's true compensation amounts if he had more thoroughly examined the financial statements provided him by McKnew.

Given the Supreme Court and the Fourth Circuit's interpretation of the appropriate standard, KMK and Diversified justifiably relied on Mr. McKnew's representations. As was clearly held in *In re Biondo*, a sophisticated entity is not required to examine financial statements but can justifiably rely upon the debtor's representation. 180 F.3d at 135 (citing *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)). Plaintiffs are not required to continually look over an entity's shoulder.

cial trouble. KMK never produced a self sustaining cash flow so as soon as the venture

capital vanished, McKnew could no longer take any compensation.

Here Kelley and Kidd received numerous representations that McKnew received only the agreed amount of compensation. When Kelley and Kidd did direct questions to McKnew concerning certain of the financial information they received, McKnew answered their inquiries by assuring them he only took the agreed upon monies and suggested the higher amounts shown only represented an accrual and not actual withdrawals of compensation. McKnew's principal argument that KMK did not justifiably rely on McKnew's representations lies in the draft KMK balance sheet as of December 31, 1997, distributed to Kelley and Kidd. This financial report, compiled from information provided to KMK's accountants, Carter Corbin & Company, by McKnew, showed an amount under professional fees identified as "Consulting–Other" in the amount of $121,136.00. This amount, McKnew maintains, was so large it should have provoked an inquiry by Kelley and Kidd which would have revealed McKnew's true compensation. This attempt at obfuscating the amount of money which McKnew relieved from KMK is hardly enough to overcome the numerous misrepresentations made by McKnew, which led Kelley and Kidd to believe McKnew followed their compensation agreement. It is doubtless in retrospect Kelley and Kidd wish they had more closely examined this particular entry on one financial statement. However, this one instance of less artful concealment and the general availability of checking account records are hardly sufficient to negate the numerous other circumstances which justified Kelley's and Kidd's reliance on McKnew's misrepresentations. Therefore, KMK justifiably relied upon McKnew's representation that he was only receiving a salary of $10,000 per month.

Furthermore, Diversified could justifiably rely upon McKnew's representations. There was no circumstance to alert Diversified that McKnew did not intend to obey the restrictions placed on the funds. In organizing the business, Kidd, Kelley, and McKnew, agreed to segregate the venture capital from the factoring capital. When McKnew raised the issue that KMK was stretching payments to vendors, Kelley confronted McKnew in a written response with his concern McKnew was not honoring the usage restriction on the Diversified monies. McKnew's written reply acknowledged he knew of the restriction in November [1997] and stated he made "every effort to honor your [Kelley's] concern." After the receipt of this additional assurance, and in the absence of any contrary evidence, Kelley on behalf of Diversified surely could justifiably rely upon McKnew's representations.

E. Did KMK's and Diversified's Damages Proximately Result from McKnew's Representations?

Having found McKnew's actions satisfy the other elements of § 523(a)(2)(A), the final issue is whether or not the plaintiffs' harm resulted from the debtor's representations. Proximate cause is both (1) causation in fact "loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;" and (2) legal causation, "if the loss might reasonably be expected to occur from the reliance." Restatement (Second) of Torts §§ 546, 548A; *See also Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir.1991); *In re Grant*, 237 B.R. at 117; *Shannon v. Russell (In re Russell)*, 203 B.R. 303, 313 (Bankr.S.D.Cal.1996).

In the case *sub judice*, the issue is whether there is a causal connection between the Debtor's misrepresentations and the plaintiffs' harm. The trial testimony clearly shows how McKnew harmed KMK.

By misrepresenting his compensation, McKnew took more money than he was allowed. These withdrawals directly impaired KMK's profits and cash flow. Kidd and Kelley relied upon McKnew's representations that he was only taking $10,000 per month in salary. Once the investors discovered the debtor's fraudulent conduct through an external audit, the investors immediately removed McKnew's ability to draw checks on KMK's account.

Furthermore, there is a clear causal connection between McKnew's actions and the harm to Diversified. McKnew, after exhaustion of the venture capital contributed by Kelley and Kidd, utilized the factoring capital contributed by Diversified. Diversified had loaned money to KMK for the specific purpose of factoring capital, but McKnew converted the money for his own personal use and for payment of other administrative uses, thereby directly harming Diversified by misusing its funds. Had McKnew not taken the money, Diversified would not suffer such a loss. The Diversified monies would have been available for use to purchase commissions. As Kelley aptly described the source of KMK's financial dilemma, "[t]he problem seems to lie in the use of factoring capital for other purposes."

While it is doubtless Diversified agreed to the business risk inherent in the use of its monies to purchase receivables, it did not accept the risk McKnew would convert the money for his own personal use. *Kansas Nat'l Bank & Trust Co. v. Kroh (In re Kroh)*, 88 B.R. 972, 984 (Bankr.W.D.Mo. 1988) (holding the bank would not have made the loan absent the debtors' misrepresentations). At the very least, his conversion removed the money from KMK and thereby eliminated any opportunity for it to repay the loan.

Unlike *In re Grant*, 237 B.R. at 97, and *Kaufman v. Vamvakaris (In re Vamva-*

*karis)*, 197 B.R. 228 (Bankr.E.D.Va.1996), there is a direct relationship between the loss and the debtor's actions. In *In re Grant*, the plaintiffs failed to show any causal connection between the debtor's misrepresentation of his marital status at the time of leasing a dwelling and the physical damage subsequently done to the leased condominium. 237 B.R. at 118. Similarly, in *In re Vamvakaris*, the plaintiff failed to show any causal connection between the harm and the misrepresentation. 197 B.R. at 231. "There is simply no evidence here of a correlation between debtor's misrepresenting his theft insurance coverage and the subsequent loss of plaintiff's jewelry." *Id.* In the case at bar, McKnew removed the loaned funds from the business and converted them for his own personal use and other uses. Thus, his misrepresentations directly precluded any opportunity for Diversified to recover its loans, and therefore, Diversified was proximately harmed by McKnew's actions.

Having satisfied each of the elements required under § 523(a)(2)(A) of the Bankruptcy Code, the indebtedness to KMK represented by the excessive compensation removed by McKnew and the indebtedness of KMK to Diversified guaranteed by McKnew are non-dischargeable.

II.

A. Fraud Or Defalcation While Acting In A Fiduciary Capacity

KMK seeks to recover the monies removed by McKnew in excess of his agreed compensation alleging § 523(a)(4) prohibits discharge of this indebtedness. Specifically, KMK alleges that as manager and operator of KMK, there was a fiduciary relationship between KMK and McKnew. (Compl.¶ 38.) KMK further alleges McKnew intended to deceive KMK while acting in a fiduciary capacity and

KMK justifiably relied on the fraud by McKnew. (Compl.¶ ¶ 39, 40.) Finally, KMK alleges its reliance on McKnew's fraud, while acting in a fiduciary capacity, was a proximate cause of KMK's loss.

■ Section 523 of the Bankruptcy Code prohibits the discharge of an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity. 11 U.S.C. § 523(a)(4) (2001). In order for KMK to prevail under § 523(a)(4), it must prove (1) that the debt in issue arose while McKnew acted in a fiduciary capacity and (2) the debt arose from his fraud or defalcation. *Global Express Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 682 (Bankr.E.D.Va. 2001). The term "fiduciary" is narrowly construed, and Courts' limit the term "fiduciary capacity" to actions by individuals under express or technical trusts that existed before the defalcation claim arose. *Id.* Accordingly, the exception from discharge applies "... only to a debt created by a person who was already a fiduciary when the debt was created." *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (citation omitted)). Courts have long recognized this limitation on the scope of this provision to technical trusts. In *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), the Supreme Court considered whether a factor who retained his principal's money was a "fiduciary debtor" within the Bankruptcy Act of 1841. Holding that a factor was not a fiduciary, the Court delineated technical and implied trusts:

> If the act embrace[s] [a factor's] debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost

all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act.

*Id.* at 208.

Following this general principle, the bankruptcy courts of the Eastern District of Virginia are reticent to impose liability under § 523(a)(4) except in those instances where the Courts found an express trust in existence. *Compare In re Davis*, 262 B.R. at 683 (holding that a debtor acted in a fiduciary capacity to a creditor under trust agreement by virtue of the debtor's position as a major shareholder, director and president, of the corporate signatory to trust), with *Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 852 (Bankr.E.D.Va.1986) (holding the existence of a partnership does not *per se* create a fiduciary relationship within the meaning of § 523(a)(4)); *Commonwealth of Va. Comm'n. of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 904 (Bankr.E.D.Va. 1985) (holding no fiduciary relationship existed between state and debtors who failed to remit license proceeds because there was no intent to create a trust in state statutes); *Harmon v. Scott (In re Scott)*, 203 B.R. 590, 596 (Bankr.E.D.Va.1996) (paying in advance for services did not create any express trust); *Snap–On Tools Corp. v. Rigsby (In re Rigsby)*, 18 B.R. 518 (Bankr.E.D.Va.1982) (holding that consignment and dealer agreements between debtor and creditor did not create express trust); *Sager v. Lewis (In re Lewis)*, 94 B.R. 406, 410 (Bankr.E.D.Va.1988) (incurring debt from defalcation of money by partner from partnership did not occur while acting in a fiduciary capacity); and *CBR, Inc. v. Naff (In re Naff)*, No. 96–21436–SCS, 1997 WL 1088126, at *13

(Bankr.E.D.Va. July 18, 1997) (holding that failure of a seller to pay over proceeds of sale to a lender secured by inventory does not constitute defalcation while acting in a fiduciary capacity).

Thus, in the Eastern District of Virginia, courts restrict the term "fiduciary" as used in § 523(a)(4) to "the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors and partners." *In re Lewis*, 94 B.R. at 406. It appears the Fourth Circuit Court of Appeals has not weighed in on this distinction in any published decision. However, in two unpublished decisions, the Fourth Circuit has endorsed the notion that an express or technical trust must arise to impose liability under § 523(a)(4). *See Bradley v. Kelley (In re Kelley)*, 948 F.2d 1281 (4th Cir.1991) (unpublished table decision) (holding that since Virginia statute did not create a trust *res* or impose trust responsibilities, debtor who was president of company issuing defaulted securities was not in fiduciary relationship); *Harrell v. Merchant's Express Money Order Co. (In re Harrell)*, 173 F.3d 850 (4th Cir.1999) (unpublished table decision) (holding that "under this section [523(a)(4) ], a fiduciary is limited to instances involving express or technical trusts.").

Other courts within the Fourth Circuit have, on occasion, expanded the scope of circumstances where a fiduciary relationship was found to exist for the purposes of § 523(a)(4). In *McLean v. Hildebrand (In re Hildebrand)*, 230 B.R. 72, 78 (Bankr. D.Md.1999), a partner of an accounting firm allegedly performed work for his former clients without compensating the partnership. The partnership sought to bar discharge of the partner's obligation to pay over the proceeds realized from these accounting services. There the court held that Maryland state law created a trust duty upon a partner that is expressed and arises before any wrongful act and therefore supported imposition of a fiduciary duty under § 523(a)(4). *Id.* at 77.[42]

Courts in other jurisdictions impose a fiduciary duty where a corporate officer has improperly received compensation. This jurisprudence is especially true of the Fifth Circuit Court of Appeals, where courts often find partners and corporate officers are fiduciaries. *See Sheerin v.*

---

**42.** The applicable Maryland statute relied upon by the court provided as follows:

§ 9–404 Partner accountable as a fiduciary.

(A) Accounting required.-Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

(B) Applicability to estates of deceased partners.-This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner.

*In re Hildebrand*, 230 B.R. at 75–76(quoting Md.Code Ann. Corps. & Ass'ns. § 9–404 (1996)). *See also Republic of Rwanda v. Uwimana*, 255 B.R. 669, 674 n. 6 (D.Md.2000) (holding that an ambassador occupies country's highest positions of trust and whose duties include management of courts funds, is a fiduciary for purposes of § 523(a)(4)); *Am. Honda Finance Corp. v. Francis*, Civ. A. No. 92–0085, 1993 WL 208236, at *3 (W.D.Va. 1993) (holding that a debtor who was president of the company and who failed to remit proceeds of sale of inventoried motorcycles under "floor plan" financing arrangement, was a fiduciary to financing creditor).

*Davis (In re Davis)*, 3 F.3d 113, 114 (5th Cir.1993) (holding that a corporate president who improperly took cash advances from the company was a fiduciary); *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 184 (5th Cir.1997) (holding a chapter 7 debtor's duties to the limited partners as partnership's general partner, made him fiduciary under § 523(a)(4)); *LSP Inv. Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 782 (5th Cir.1993) (holding that a general partner of a limited partnership, who wrongfully charged the limited partners for partnership expenses, was a fiduciary). Other courts of appeals have held partners or corporate officers as fiduciaries for § 523(a)(4) purposes. In *In re Frain*, 230 F.3d 1014 (7th Cir.2000), shareholders of a closely held corporation sought to except from discharge an indebtedness owed to them by the debtor, who owned fifty percent (50%) of the shares of the corporation and was chief operating officer thereof. Upon the officer's filing of bankruptcy, the other shareholders sought to except from discharge certain loans owed to them, on the basis that the debtor had violated provisions of a shareholder agreement by making shareholder distributions prior to payment of the loans; thus, the debtor was a fiduciary and had committed a defalcation under § 523(a)(4). The court first noted its earlier definition that a fiduciary relationship under § 523(a)(4) is "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendency over the latter." *Id.* at 1017 (quoting *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994)). The court then concluded the substantial concentration of power under the corporate structure was sufficient to create a fiduciary duty on the part of the debtor for the purposes of § 523(a)(4):

> While the parties' access to knowledge and information may have been reason-

ably similar, the concentration of power was substantially one-sided. The shareholder's agreement was structured to give Frain [the debtor] ultimate power over both his own employment and the direction of the corporation. Frain's control over the day-to-day business of the corporation and ownership of 50% of the shares gave him significant freedom to run the corporation as he saw fit, including oversight of such items as salary and distributions of corporate cash flow. The only real limit to his power was the chance of deadlock; that is, if he voted his 50% one way and O'Shea and Schoenfeld [the plaintiff shareholders] voted their combined 50% the other, nothing would happen. A further reading of the thirty-plus-page contract discloses that "major decisions shall require the consent of the holders of seventy-five percent (75%) of the voting common shares" (with some decisions requiring 100%). The contract defined "major decisions" to include "all decisions affecting the Corporation which are not in the ordinary course of business of the Corporation." So no major decisions can be made unless Frain agrees.

. . . . .

In this case, a fiduciary relationship was created by the structure of the corporation under the shareholder agreement, which had given Frain a position of ascendancy under our case law. Frain argues that violations of a contract entered into by equals are not covered by § 523(a)(4). However, Frain had a pre-existing fiduciary obligation to O'Shea and Schoenfeld independent of any breach of contract. This is not a case where a fiduciary relationship was implied from a contract. *See Bennett*, 989 F.2d at 784 (§ 523(a)(4) does not cover fiduciary duty implied from contract).

A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over O'Shea and Schoenfeld.

*Id.* at 1017–18. The Ninth Circuit Court of Appeals in *Lewis v. Scott (In re Lewis),* 97 F.3d 1182 (9th Cir.1996) concluded that the trustee of a partner was a fiduciary to the other partners of the partnership who commingled that partner's investment with other funds. Looking to Arizona law, the court found Arizona statutory law imposes an express trust relationship and thus the trustee of a partner was a fiduciary under § 523(a)(4).[43] *Id.* at 1185. *But see Driggs v. Black (In re Black),* 787 F.2d 503, 506–07 (10th Cir.1986) (applying Utah law, a corporate officer owes a duty to shareholders collectively and not to stockholders individually, precluding conclusion that majority shareholder was a fiduciary as to minority shareholder), *abrogated on other grounds by Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Other courts have concluded corporate officers or directors occupied a fiduciary relationship for purposes of § 523(a)(4). *See Flegel v. Burt & Assocs., P.C. (In re Kallmeyer),* 242 B.R. 492, 495 (9th Cir. BAP 1999) (interpreting Oregon trust fund doctrine to conclude, a director owed corporate creditors a fiduciary duty); *Cundy v. Woods (In re Woods),* 175 B.R. 78, 83 (Bankr.D.Colo.1994) (holding that joint venturers and management committee members have fiduciary obligations and "Colorado common law imposes upon corporate directors and officers a technical trust relationship similar to that imposed upon partners, such that corporate directors and officers also act in a fiduciary capacity within the meaning of § 523(a)(4)"); *Associated Grocers of Colo., Inc. v. Horton (In re Horton),* 152 B.R. 912, 915 (Bankr.S.D.Tex.1993) (holding members of cooperative grocery association had a fiduciary relationship with the association itself); *Assurance Sys. Corp. v. Jackson (In re Jackson),* 141 B.R. 909, 916–17 (Bankr.N.D.Tex.1992) (stating that officers and directors of corporation by transferring all corporate assets without stockholder approval were fiduciaries for purposes of § 523(a)(4)); *United Va. Bank v. Fussell (In re Fussell),* 15 B.R. 1016, 1020 (E.D.Va.1981) (holding that an officer who misused his position as a corporate officer to obtain repayment of his personal loans in contravention of subrogation agreement with creditor committed fraud or defalcation within the meaning § 523(a)(4)); *Hall v. Johann (In re Johann),* 125 B.R. 679, 681–82 (Bankr. M.D.Fla.1991) (holding that an officer of debtor-in-possession who paid himself compensation without court approval was fiduciary for § 523(a)(4)). Other courts have concluded the general fiduciary duty owed to a corporation under state law is not sufficient, by itself, to impose fiduciary capacity for § 523(a)(4) bankruptcy purposes. *See Ploetner–Christian v. Miceli (In re Miceli),* 237 B.R. 510, 516 (Bankr. M.D.Fla.1999); *ProSports Mgmt. of the*

---

**43.** The Arizona statute relied upon by the Ninth Circuit Court of Appeals to find a fiduciary relationship provides as follows:

Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property. *Lewis v. Scott (In re Lewis),* 97 F.3d 1182, 1185 (9th Cir.1996) (quoting A.R.S. § 29–221(A)) (statute repealed by Act effective Jan. 1, 2000, ch. 226 § 46, 1996 Ariz. Legis. Serv. 226 (West)).

*South, Inc. v. Jacobs (In re Jacobs)*, 243 B.R. 836, 843 (Bankr.M.D.Fla.2000) (stating that "because Florida statutory and case law lack any provision that creates a trust relationship or finds a corporate officer to be a trustee over corporate assets, [the plaintiff] *ProSports* has failed to prove that [the debtor] was acting in a fiduciary capacity within the context of § 523(a)(4)"); *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 787 (10th Cir. BAP 1997) (stating "even though the Oklahoma state courts may approve of a general policy that creates a fiduciary duty between joint venturers, this policy is not sufficient to fulfill the Tenth Circuit's requirements of a common law trust for purposes of § 523(a)(4)"); and *Kayes v. Klippel (In re Klippel)*, 183 B.R. 252, 260–61 (Bankr.D.Kan.1995) (holding that a general fiduciary duty of loyalty, good faith, and fair dealing of joint venturer under Kansas law insufficient to impose fiduciary duty under § 523(a)(4)). No decisions heretofore appear to have specifically considered the imposition of a fiduciary status for purposes of § 523(a)(4) upon a manager or member of a limited liability company.

To determine the existence of a fiduciary relationship under § 523(a)(4), a court must apply federal law. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir.1996) (citing *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 & n. 2 (6th Cir.1982)). However, state law is relevant to this inquiry. *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir.1982). Accordingly, an examination of the law of Virginia concerning the relationship of managers and members of a limited liability company to the company is appropriate to assist in the determination as to whether McKnew acted in a fiduciary capacity for § 523(a)(4) purposes.[44]

Limited liability companies are a relatively recent artificial entity in Virginia, as the Virginia General Assembly only enacted the enabling legislation to permit the formation of a limited liability company, the Virginia Limited Liability Company Act, in 1991.[45] See Virginia L.L.C. Act, Va.Code Ann. §§ 13.1–1000–1073 (1991). The limited liability company is a business form that combines the limited liability of a corporation with the pass-through tax status, which is characteristic of the general partnership, limited partnership, and the S corporation. "Constitutionally Mandated Fairness and the Limited Liability Company: An Argument for the Extra–Territorial Application of Limited Liability Company Statutes," 1 Geo. Mason Independent L.Rev. 83 (1992).

The Virginia L.L.C. Act provides for general standards of conduct for a manager of a Virginia limited liability company, requiring that a manager discharge his duties in accordance with his good faith business judgment of the best interests of the limited liability company. Va.Code Ann. § 13.1–1024.1 (1999).[46] There is no

---

**44.** Pursuant to the statutes of the Commonwealth of Virginia, KMK met the requirements of a limited liability company and it is undisputed McKnew was both a co-manager and member of KMK.

**45.** For a commentary concerning the Virginia Limited Liability Company Act, see "The Dawn of the Limited Liability Company in Virginia: An Analysis of the Statute, 14 Geo. Mason L.Rev. 177 (1992)."

**46.** Section 13.1–1024.1 of the Code of Virginia, provides as follows:

A. A manager shall discharge his or its duties as a manager in accordance with the manager's good faith business judgment of the best interests of the limited liability company.

B. Unless a manager has knowledge or information concerning the matter in question that makes reliance unwarranted, a manager is entitled to rely on information,

such provision concerning members of a limited liability company; therefore, unlike partnerships, there are no fiduciary obligations among members. *In re Garrison–Ashburn, L.C.*, 253 B.R. 700, 708 n. 7 (Bankr.E.D.Va.2000). Based upon such provisions setting forth the standards of conduct of a manager, limited liability managers have a fiduciary duty to the limited liability company. *See* Carter G. Bishop & Daniel S. Kleinberger, Limited Liability Companies Tax and Business Law, ¶ 10.01[1][C], ¶ 10.01[2][6] (2001). However, no provisions of the Virginia L.L.C. Act appear to impose any trust upon funds contributed to a limited liability company for capital or otherwise; nor do provisions in any manner address the relationship between a manager and the monies of a limited liability company. Perhaps the newness of limited liability companies as artificial entities in Virginia explains why no Virginia state or federal courts have developed any common law concerning the relationship of a Virginia limited liability company manager and monies of the corporation.

Virginia decisions for some time have concluded that an officer of a Virginia corporation, in his dealings with the corporation, has the same duty of fidelity which arises in dealing between a trustee and a beneficiary of the trust. *Adelman v. Conotti Corp.*, 215 Va. 782, 213 S.E.2d 774, 779 (1975) (citing *Deford v. Ballentine Realty Corp.*, 164 Va. 436, 180 S.E. 164 (1935)). Accordingly, "a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation." *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725, 731 (1990) (quoting *Rowland v. Kable*, 174 Va. 343, 6 S.E.2d 633, 642 (1940)).

It is against this template that this Court must conclude whether McKnew, as a co-manager of KMK, had a fiduciary relationship with KMK so as to permit imposition of a fiduciary relationship under § 523(a)(4). As "defalcation" under § 523(a)(4) includes not only conduct involving bad faith but also the mere failure to account for funds entrusted to a fiduciary, *In re Lewis*, 94 B.R. at 408, it is doubtless that, if this Court concludes McKnew took excess compensation from KMK while acting in a "fiduciary capacity," McKnew's indebtedness to KMK, for the unauthorized monies he removed, is non-dischargeable.[47]

opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

 1. One or more managers or employees of the limited liability company whom the manager believes, in good faith, to be reliable and competent in the matters presented;

 2. Legal Counsel, public accountants, or other persons as to matters the manager believes, in good faith, are within the person's professional or expert competence; or

 3. A committee of the managers of which the manager is not a member if the manager believes, in good faith, that the committee merits confidence.

 C. A person alleging a violation of this section has the burden of proving the violation.

 D. For the purposes of this section only, the term "manager" shall be deemed to include any member that is participating in the management of the limited liability company. Va.Code. Ann. § 13.1–1024.1 (1992).

The good faith business judgment provisions of the Virginia L.L.C. Act are virtually identical to the standards of conduct statutorily imposed by the Virginia Stock Corporation Act upon directors of stock corporations. See Va.Code Ann. § 13.1–690 (1985); *Flippo v. CSC Assocs. III, L.L.C.*, 262 Va. 48, 547 S.E.2d 216, 221 (2001).

**47.** This Court has previously concluded McKnew committed fraud in his removal of excess compensation from KMK. *See supra* Section I.

Despite the numerous decisions in other jurisdictions which have found a fiduciary duty arising from statutorily or common law imposed general fiduciary obligations, the consistent strictness of definition of fiduciary relationship previously exercised by the decisions of this Court guides it again today. This Court's reticence to extend the imposition of a fiduciary relationship for the purposes of § 523(a)(4) beyond circumstances of pre-existing express or technical trusts continues throughout the case law of this district. This Court also finds persuasive the reasoning of those courts that eschewed the opportunity to transform generalized statutory duties of trust and fair dealing into the fiduciary relationship demanded by § 523(a)(4). The Virginia L.L.C. Act contains such a provision mandating a subjective business judgment standard of conduct for a manager; however, transforming this provision into a § 523(a)(4) fiduciary relationship of McKnew to KMK appears to this Court, absent a showing of additional special circumstances, contrary to the long lineage of decisions requiring existence of an express or technical trust relationship with an identifiable *res* to impose § 523(a)(4) liability.

This Court finds further support for this conclusion by reviewing the many decisions outside of this jurisdiction, which have relied upon specific statutory impositions of a trust relationship to impose a § 523(a)(4) fiduciary relationship. *See, e.g., In re Hildebrand,* 230 B.R. at 75–76. The Virginia L.L.C. Act imposes no such trust relationship concerning the monies of a limited liability company; and analogizing to Virginia decisions concerning offi-

cers and directors, nor does the common law of Virginia suggest anything other than a generalized fiduciary duty would be imposed upon a limited liability company manager. Here, the plaintiffs' allege McKnew converted a portion of the general monies of KMK, which Kelley, Kidd and third parties, contributed as capital or as loans. The venture capital portions of these monies,[48] KMK could only use in its business operations, subject to Kelley and Kidd's restriction on McKnew's maximum amount of compensation. This Court also views as unlikely that the Fourth Circuit Court of Appeals would adopt the Seventh Circuit's reasoning that an inequality of knowledge or bargaining power may impose a § 523(a)(4) fiduciary relationship. *In re Frain,* 230 F.3d 1014 (7th Cir.2000). As such, the imposition of a fiduciary relationship here would unnecessarily stretch the long imposed restriction of limiting such a relationship to an express or technical trust, and instead impose it to an instance where traditional concepts of embezzlement or larceny more nearly fit. Having concluded the acts of McKnew complained of did not occur in the course of a fiduciary relationship for the purposes of § 523(a)(4), Count II of the Complaint of KMK fails and provides no basis to render the indebtedness of McKnew to KMK non-dischargeable.

### B. Embezzlement and Larceny

Count III of the Complaint additionally seeks recovery from McKnew on behalf of KMK [49] on the basis of his alleged violation of § 523(a)(4) of the Bankruptcy Code, rendering debts non-dischargeable if incurred by reason of

---

**48.** Diversified restricted usage of its loans to the purchase of commission receivables, and such funds were not available for use in business operations, such as McKnew's compensation. *See supra* Findings of Fact.

**49.** Count III of the Complaint, which seeks recovery from McKnew on the basis of his alleged violations of 11 U.S.C. § 523(a)(4), makes no allegations or theory of recovery on behalf of Diversified.

embezzlement or larceny. KMK alleges McKnew appropriated funds from KMK for his own benefit by fraudulent intent or deceit, and McKnew deposited KMK funds in an account accessible only to him (Compl.¶¶ 42, 43). KMK further alleges McKnew's use of KMK funds was without explanation, reason or purpose, associated with his KMK duties and obligations, and were done without the knowledge, consent or authorization of Kelley and Kidd. (Compl.¶ 44.) KMK finally alleges McKnew fraudulently and wrongfully took and carried away the property of KMK with the intent to convert such property for his use without KMK's consent. (Compl.¶ 45.) For these reasons, KMK asserts that McKnew's obligation to KMK is not discharged pursuant to 11 U.S.C. § 523(a)(4).

■■■ In addition to excepting debts from discharge, which arose by defalcation while acting in a fiduciary capacity, 11 U.S.C. § 523(a)(4) likewise prohibits the discharge of debts incurred by embezzlement or larceny. 11 U.S.C. § 523(a)(4) (2001). This Court has defined "embezzlement" as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 671 (Bankr.E.D.Va.2001) (citing *Weigend v. Chwat (In re Chwat)*, 203 B.R. 242, 248 (Bankr.E.D.Va.1996)); *Hyman Wholesale Corp. v. Allman (In re Allman)*, 147 B.R. 122, 125 (Bankr.E.D.Va.1992); *Va. Comm'n of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 904 (Bankr.E.D.Va.1985); *Hall v. Blanton (In re Blanton)*, 149 B.R. 393, 394 (Bankr. E.D.Va.1992). Larceny is the "fraudulent or wrongful taking and carrying away of the property to the taker's use without the consent of the owner." *In re Davis*, 262

B.R. at 672 (citing *4 Collier on Bankruptcy* at ¶ 523.10[2] ). Embezzlement is distinguishable from larceny because the original acquisition of the property was lawful, or at least with the consent of the owner, unlike with larceny, where there is a requirement that felonious intent exist at the time of the taking. *In re Davis*, 262 B.R. at 671 (citing *Werner v. Hofmann (In re Hofmann)*, 144 B.R. 459, 464 (Bankr. D.N.D.1992), *aff'd*, 5 F.3d 1170 (8th Cir. 1993)); *Gore v. Kressner (In re Kressner)*, 155 B.R. 68, 73–74 (Bankr.S.D.N.Y.1993), *aff'd*, 152 F.3d 919 (2d Cir.1998). Neither an embezzlement nor larceny must occur to require the debtor was acting in a fiduciary capacity for the purposes of 11 U.S.C. § 523(a)(A); therefore to prevail on a claim of non-dischargeability due to larceny or embezzlement, a creditor is not required to show the debtor undertook the alleged wrongful acts while "acting in a fiduciary capacity." *Rountrey v. Lee (In re Lee)*; 90 B.R. 202, 208 (Bankr.E.D.Va. 1988) (citing *Great Am. Ins. Co. v. Storms (In re Storms)*, 28 B.R. 761, 764–65 (Bankr.E.D.N.C.1983); *Va. Comm'n of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 905 (Bankr.E.D.Va. 1985)), *overruled on other grounds by Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

■■■ To establish embezzlement, the plaintiffs must prove (1) the debtor's appropriation of property was for the debtor's benefit and (2) the appropriation occurred with fraudulent intent or by deceit. *Weigend v. Chwat (In re Chwat)*, 203 B.R. 242, 247 (Bankr.E.D.Va.1996) (citing *Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 855 (Bankr.E.D.Va.1986)). Thus, in order to prevail, a creditor must establish that the debtor appropriated the funds with fraudulent intent; "[e]ven where a case might imply some sort of trust by virtue of a debtor holding funds for another, the debt-

or's subsequent appropriation of the funds will not amount to an embezzlement absent proof of the debtor's fraudulent intent." *Hall v. Blanton (In re Blanton)*, 149 B.R. 393, 394 (Bankr.E.D.Va.1992) (quoting *Va. Comm'n of Game & Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 905 (Bankr.E.D.Va.1985)). The court may infer intent from the debtor's actions and surrounding circumstances. *Id.* (citing *Moonan v. Bevilacqua (In re Bevilacqua)*, 53 B.R. 331, 334 (Bankr.S.D.N.Y.1985)); *see also In re Chwat*, 203 B.R. at 249. The proper inquiry for the court concerning the intent of the debtor is whether there is "intent to convert, not intent to harm." *In re Taylor*, 58 B.R. at 855. Thus, ill will toward the plaintiff is unnecessary and a plaintiff "need not prove that the debtor acted out of spite, ill will, or hatred in order to prove embezzlement within the meaning of section 523(a)(A)." *Id.*

As the monies of KMK appear initially to have lawfully come into the control of McKnew, the facts do not support a claim of larceny. KMK duly appointed McKnew a co-manager who ran the day-to-day operations of KMK, including all finances and disbursements of money. He continued with this responsibility until relieved in late September 1998 upon the discovery by Kelley of the excessive monies withdrawn by the debtor from KMK. As KMK empowered him to conduct its financial affairs, including disbursement of monies to third parties, McKnew effectively had the authority to manage the monies deposited into KMK; thus, having come into control of the monies of KMK lawfully, the evidence cannot support a conclusion that McKnew committed larceny.

Applying the elements necessary to establish a nondischargeable claim of embezzlement, it would appear the circumstances here prove by a preponderance of the evidence McKnew embezzled the monies taken by him via Colony Holdings, which were in excess of the compensation amounts agreed to by McKnew, Kelley and Kidd. The evidence is clear, as afore stated, McKnew was co-manager of KMK and empowered to conduct the daily financial operations of the limited liability company, including the authorization of disbursement of monies and the actual signing of checks. The fact that McKnew removed the excess monies in his capacity as co-manager of KMK is of no moment. "The act of embezzlement is committed by an individual, and that individual will not be permitted to shield himself from dischargeability for fraud by asserting he was acting as an employer-officer of the corporation." *Sohio Chem. Co. v. Berkemeier*, 51 B.R. 5, 6 (Bankr.S.D.Ind.1983). This rule is particularly true when the debtor acted as the president and manager of a corporation. *Id.*

■ This Court has previously found that McKnew, Kelley and Kidd, agreed to limit McKnew's compensation from KMK to a maximum of $10,000.00 the first year of operation and $10,417.00 the second year. Beginning almost immediately, McKnew withdrew and paid to himself amounts of compensation far in excess of the stipulated amounts. The evidence is also uncontroverted that when money was transferred from KMK to Colony Holdings, at the time of each transfer, McKnew immediately shifted the monies from the Colony Holdings account into his personal account, where he ultimately expended the funds for a variety of personal expenses and activities. This Court also believes the appropriation of these excessive monies was done by McKnew with a fraudulent intent and by deceit. McKnew's explanation of the withdrawal of the monies based on his alleged agreement with Kelley to permit payment of such amounts as McKnew's family needed according to the

cash flow of KMK is, again, simply not credible. Rather, the circumstances here amply prove McKnew's fraudulent intent. McKnew removed these additional monies with the intent to permanently deprive KMK of their benefit and use.[50] His actions to conceal the actual amount of compensation he received from KMK further buttresses McKnew's fraudulent intent. His early financial reports given to Kelley and Kidd omitted the substantially greater amounts of monies he continually removed· from KMK, thus presenting a fraudulent status report of KMK's finances and his compensation. McKnew's later financial reports presented his compensation either in a manner that intentionally obfuscated the amounts taken or in a form that hid in an oblique category such as "unallocated" the difference between what he reported as compensation and the true amount removed. Even the larger amount McKnew included in his later report to Kelley and Kidd, when questioned, McKnew mischaracterized.it as representing only an accrual and not an amount actually paid. All of these misrepresentations by McKnew aptly betray McKnew's fraudulent and deceitful intent in removal of these monies substantially in excess of his authorized amounts.

The facts here are substantially in opposite of those of another decision by this Court. In *Detroit Auto Brokerage, Inc. v. Denson (In re Denson)*, 7 B.R. 213 (Bankr. E.D.Va.1980), a creditor attempted to bar the discharge of its sole salesman who allegedly took draws in excess of his authorized compensation. There the debtor never concealed the amounts of his draws and the owner of the creditor testified ambiguously as to the compensation arrangement, stating the compensation arrangement was to "split the profits as they came in." [51] *Id.* at 215. Such evidence prohibited a finding of embezzlement. Similarly, in *Maneval v. Davis (In re Davis)*, 155 B.R. 123, 130 (Bankr.E.D.Va. 1993), the debtors openly used the proceeds of a sale of stock without any attempt to conceal their conduct, negating any intent to embezzle.

Here, the facts before this Court are substantially variant: McKnew agreed to a definite, non-ambiguous compensation arrangement with Kelley and Kidd to limit his total compensation to $10,000.00 per month the first year of operation and approximately $10,400.00 the second year. McKnew, unlike the debtors in *Denson* and *Davis*, concealed his removal of excessive compensation, providing false and misleading financial information to Kelley and Kidd. When confronted with the discovery of the excessive removal of monies, McKnew did not protest and argue his entitlement to the compensation. Rather, he quickly—and frequently—apologized for his actions, both verbally and in writing, candidly admitting, "I was wrong—I am sorry."

█ McKnew's fraudulent and deceitful intent is clear from the evidence here.

---

**50.** The evidence is unmistakable that McKnew never had any intention of replacing the excess monies he withdrew until Kelley and Kidd discovered his wrongful conduct in late September 1998. In any event, even an intent to temporarily deprive lawful owner of funds may support à conclusion of embezzlement. *Clark v. Taylor (In re Taylor)*, 58 B.R. 849, 855 (Bankr.E.D.Va.1986).

**51.** Indeed, the company's owner illustrated the ambiguity of the arrangement when he confronted the debtor as to the excess draws. The debtor, in what this Court characterized as uncontroverted testimony, explained to the owner he was entitled to the money; providing a response from the owner of "if you [the debtor]...are selling cars, I don't care what you draw." *Detroit Auto Brokerage, Inc. v. Denson (In re Denson)*, 7 B.R. 213, 215 (Bankr.E.D.Va.1980).

An officer's unauthorized withdrawal of corporate funds for compensation constitutes embezzlement within the meaning of § 523(a)(4), rendering the resulting corporate debt non-dischargeable. *Ferraro v. Phillips (In re Phillips)*, 185 B.R. 121, 129 (Bankr.E.D.N.Y.1995); *Hall v. Johann (In re Johann)*, 125 B.R. 679, 681–82 (Bankr. M.D.Fla.1991). McKnew's withdrawal of the monies in excess of his authorized compensation was not authorized by Kelley and Kidd and was done by McKnew with the intent to permanently deprive KMK of these monies. As such, his acts constitute embezzlement pursuant to 11 U.S.C. § 523(a)(4) and warrant denial of the discharge of indebtedness he owes to KMK by reason of these unauthorized withdrawals.

III

Willful and Malicious Injury § 523(a)(6)

KMK and Diversified each allege that McKnew's conduct constituted wrongful acts which the debtor committed without just cause or excuse and with the intent to cause injury to KMK and Diversified. Specifically, KMK alleges McKnew caused the removal of monies from KMK far in excess of his authorized compensation. Diversified alleges it loaned money to KMK for the sole purpose of its use to purchase factored receivables. Such restriction McKnew knew of, and he ignored it, thereby, he used Diversified's monies for other purposes, including payment of compensation to himself. By this misuse of the proceeds of Diversified's loan, Diversified alleges McKnew deprived it of its monies.

Section 523(a)(6) prohibits discharge for an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (2001). The United States Supreme Court

dramatically changed the landscape of § 523(a)(6) nondischargeability proceedings in its decision *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Prior to *Geiger*, § 523(a)(6) encompassed a broad range of conduct. In *Branch Banking & Trust Co. of Va., Inc. v. Powers (In re Powers)*, 227 B.R. 73 (Bankr.E.D.Va.1998), this Court explained the prior case law:

> Courts focused on both the malice prong and the willful prong of § 523(a)(6). The word "willful" was defined as "a deliberate or intentional act which necessarily leads to injury." In proving intent prior to *Geiger*, the creditor was only required to show the debtor's act was intentional; there was no requirement to show that the injury was intended. When an act, such as conversion, was done intentionally and produced harm without just cause or excuse, it was willful and malicious for purposes of § 523(a)(6), without proof of a specific intent to injure. Intent to injure was established by showing that the debtor intentionally performed an act which necessarily caused injury or that was certain to ca[u]se injury.

*Id.* at 74 (citations omitted). Thus, a debtor could not discharge under § 523(a)(6) any intentional act, which necessarily caused an injury, even if the debtor never intended the resulting injury.

*Geiger* substantively and dramatically changed this analysis. The defendant physician in *Geiger* attempted to treat a patient's injured foot. 523 U.S. at 59, 118 S.Ct. 974. Notwithstanding existing medical protocols known to Geiger, he elected to prescribe oral penicillin to reduce the treatment cost, rather than prescribing intravenous penicillin. Later, Dr. Geiger discontinued treatment because he believed the infection had subsided. Sadly, the less effective treatment coupled with

the subsequent withdrawal of any antibiotics failed to curtail infection and the patient's foot required amputation. *Id.* After a substantial award to the patient in a malpractice action against Geiger, Geiger filed bankruptcy. *Id.* at 59–60, 118 S.Ct. 974. The patient sought to except his judgment from discharge under § 523(a)(6). *Id.* at 60, 118 S.Ct. 974.

The Supreme Court concluded the language of § 523(a)(6) encompassed only acts done with the actual intent to cause injury, and not merely intentional acts that happen to cause injury:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, *i.e.*, "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act,*" not simply "the *act itself.*"

*Id.* at 61–62, 118 S.Ct. 974 (citing RE-STATEMENT (SECOND) OF TORTS § 8A cmt. a (1964)). The Supreme Court feared acceptance of a more expansive interpretation of § 523(a)(6) would stretch the breadth of exceptions to discharge too far:

> The Kawaauhaus' more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act—for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic—could fit the description. A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."

*Id.* at 62, 118 S.Ct. 974 (citations omitted).

In *Geiger,* however, the Supreme Court cited with approval two of its prior decisions, which concerned conversion of a creditors' property,[52] clarifying that to find a conversion non-dischargeable, there must be an intentional injury. Furthermore, the Supreme Court reminded that, with reference to claims of conversion, "not every tort judgment for conversion is exempt from discharge."

> There is no doubt that an act of conversion, if willful and malicious, is an injury ... within the scope of this exception .... But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

---

**52.** *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916); *Davis v. Aetna* *Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

Decisions shortly after *Geiger* concluded that § 523(a)(6) required a showing of an intentional tort with a subjective standard of intent. *In re Powers,* decided by this Court, is illustrative. *Branch Banking & Trust Co. of Va. v. Powers (In re Powers),* 227 B.R. 73 (Bankr.E.D.Va.1998). The debtor, Powers, obtained a loan from the plaintiff bank, and pledged his securities portfolio account maintained at a brokerage institution as collateral for the indebtedness. *Id.* at 74. Powers later obtained financing from a second bank to purchase a construction company, which required him to pledge the same securities. When Powers defaulted on the second loan, he delivered possession of the securities to the second bank, who liquidated the account. The plaintiff sought to deny discharge of Powers' debt to the first bank under § 523(a)(6). This Court concluded the debt was dischargeable in light of *Geiger:*

> Likewise, this Court must apply a subjective standard of intent and determine whether the debtor, Stewart M. Powers, intended to cause injury to the plaintiff, BB & T, by delivering his Portfolio Account to First Union when BB & T had a prior security interest in the account. First, the Court must examine the intentional acts of the defendant. The defendant stipulated that he directed Paine Webber to deliver his Portfolio Account to First Union without advising BB & T. The defendant's transfer of funds was an intentional act done to subordinate the plaintiff's interest in the Portfolio Account to that of First Union. However, the debtor's intentional transfer of the plaintiff's collateral to First Union standing alone is not enough to satisfy the requirements of § 523(a)(6), when he asserted that the subordination would not injure BB & T's chances of being paid in full as he intended to pay its loan off over time. The debtor also expected

> to pay the First Union loan according to its terms which would have the effect of restoring the collateral to BB & T.

> . . . . .

> Clearly, the defendant's act of subordinating the plaintiff's interests in his Portfolio Account was an improper act, but the Court is bound by the subjective intent of the debtor in determining whether the injury to the plaintiff was intended. However, the defendant's intent was to pay the plaintiff the balance due it, even though he subordinated its interest to First Union.

*Id.* at 76–77; *see also Roumeliotis v. Popa (In re Popa),* 140 F.3d 317, 318 (1st Cir. 1998) (holding that although an employer's failure to carry worker's compensation insurance was an intentional act that caused injury, it was not done with the actual intent to cause the injury and therefore was dischargeable); *Fla. Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson),* 220 B.R. 134, 137 (Bankr.M.D.Fla.1998) (holding that the debtor's failure to turn over inventory proceeds pledged to a creditor to keep the business operative was not an intentional act to cause injury under § 523(a)(6)).

A subsequent case decided by the Fifth Circuit Court of Appeals advocated a slight erosion in this standard. In *Miller v. J.D. Abrams Inc. (In re Miller),* 156 F.3d 598 (5th Cir.1998), *cert. denied,* 526 U.S. 1016, 119 S.Ct. 1249, 1250, 143 L.Ed.2d 347 (1999), the court found the label "'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury." *Id.* at 603. Instead, the court concluded that "either objective substantial certainty or subjective motive meets the Supreme Court's definition of 'willful injury' in § 523(a)(6)." *Id.; accord Baldwin v. Kilpatrick (In re Baldwin),* 245 B.R. 131, 136 (9th Cir. BAP 2000); *J.*

*Bowers Constr. Co. v. Williams (In re Williams)*, 233 B.R. 398, 405 (Bankr. N.D.Ohio 1999).

In an unpublished opinion, the Tenth Circuit Court of Appeals rejected the substantial certainty approach of the Fifth Circuit, concluding that "the 'willful and malicious injury' exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who must have wished to cause injury or at least believed it was substantially certain to occur." *Via Christi Reg'l. Med. Ctr. v. Englehart (In re Englehart)*, No. 99–3339, 2000 WL 1275614, at *3 (10th Cir. Sept.8, 2000); *see also Su v. Carrillo (In re Su)*, 259 B.R. 909, 913 (9th Cir. BAP 2001) ("The key difference between the *Miller* and *Markowitz* holdings is that *Markowitz* followed the Restatement's requirement that the debtor *believe* that his actions will with substantial certainty cause injury, while in *Miller* the subjective belief of the debtor as to the certainty of the harm was not controlling."). Other courts following the subjective formulation first adopted by the Eighth Circuit in *Geiger*, have scrutinized the debtor's knowledge or belief concerning the consequences of his actions. The Sixth Circuit Court of Appeals has articulated that "the mere fact that [the debtor] should have known his decisions and actions put [the creditor] at risk is also insufficient to establish a 'willful and malicious injury.'" *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 465 n. 10 (6th Cir.1999). Instead, "[h]e must will or desire harm, or believe injury is substantially certain to occur as a result of his behavior." *Id; see Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999); *Via Christi Reg'l. Med. Ctr. v. Budig (In re Budig)*, 240 B.R. 397, 400–01 (D.Kan.1999); *In re Williams*, 233 B.R. at 404.

The Ninth Circuit Court of Appeals has weighed in recently in the post-*Geiger* analysis. In *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202 (9th Cir.2001), an employer withheld wages from an employee even though the employer possessed the funds to pay. The debtor argued, as had been held by the district court, that the employer must have withheld the wages with the "specific intent" of harming the employee. The Circuit Court disagreed:

In *Geiger*, the Court did not answer the question before us today-the precise state of mind required to satisfy § 523(a)(6)'s "willful" standard. The *Geiger* Court did, however, cite with approval its prior decision of *McIntyre v. Kavanaugh* and the Restatement (Second) of Torts § 8A.

In *McIntyre*, the debt arose from the debtor's conversion of the creditor's property. Holding that this debt was excepted from discharge under § 523(a)(6), the Court indicated that a wrongful act that is voluntarily committed with knowledge that the act is wrongful and will necessarily cause injury meets the "willful and malicious" standard of § 523(a)(6). Similarly, the Restatement definition of intent cited by the *Geiger* Court requires the actor either to desire the consequences of an act or to know the consequences are substantially certain to result. Under this definition, the actor's deliberate act with knowledge that the act is substantially certain to cause injury is sufficient to establish willful intent.

This definition is consistent with the approach this court took in the post-*Geiger* case of *In re Bailey*, where we stated that "[t]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury,

constitutes a willful and malicious injury within the meaning of § 523(a)(6)."

We hold, consistent with the approaches taken by the Fifth and Sixth Circuits, that under *Geiger,* the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct. We believe that this holding comports with the purpose bankruptcy law's fundamental policy of granting discharges only to the honest but unfortunate debtor.

*Id.* at 1207–08.

Prior to *Geiger,* the Fourth Circuit Court of Appeals had little trouble concluding a debtor who misappropriated or converted another's property would not receive discharge of the obligation under § 523(a)(6) of the Bankruptcy Code. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1009 (4th Cir.1985) (holding that a debtor's action in using the proceeds of a government check to buy luxury items, after he had agreed with an insurer to place the check in an account for disbursal to the insurer, amounted to willful and malicious injury); *First Nat'l. Bank of Md. v. Stanley (In re Stanley),* 66 F.3d 664, 667 (4th Cir.1995) (holding that debtor who used monies drawn from a line of credit mistakenly increased by a bank was guilty of conversion, and such actions excepted the debt from discharge as willful and malicious injury); *See also Pollock v. Gandara (In re Gandara),* 218 B.R. 808, 811–12 (Bankr.E.D.Va.1997) (holding that a patient who assigned to health care provider an interest in settlement proceeds of a personal injury action and utilized proceeds without honoring the assignment, committed willful and malicious injury); *Bodie v. Britt (In re Britt),* 156 B.R. 511, 519 (Bankr.E.D.Va.1993) (holding that a

real estate agent who withdrew escrow funds and paid them to himself committed conversion, which was non-dischargeable under § 523(a)(6)); *Harmon v. Scott (In re Scott),* 203 B.R. 590, 596–97 (Bankr. E.D.Va.1996) (retaining unearned monies remaining from six month advance of wages and spending monies after demand for their return, constitutes willful and malicious injury).

Cases subsequent to *Geiger,* considering whether acts of conversion constitute willful and malicious injury, have focused on the distinction as to whether the conversion was an intentional one or merely a reckless or negligent conversion of property. *Compare Peklar v. Ikerd (In re Peklar),* 260 F.3d 1035, 1039 (9th Cir.2001) (finding an indebtedness dischargeable where "[the debtor's] conversion of [the creditor's] property was at worst negligent, and at best 'innocent or technical,' conversion."); *In re Budig,* 240 B.R. at 401 (holding that debtor's alleged conversion of insurance benefits assigned to medical center could not constitute willful and malicious injury "[b]ecause the debtors did not know the money belonged to Via Christi [medical center], they could not have had the necessary intent to cause willful injury") with *LaBrecque v. Armada Mfg. Co.,* No. 5:98–CV–824, 1999 WL 1939980 (E.D.N.C.1999) ("This conclusion is appropriate because [the debtor] intentionally sold the boat and kept the proceeds without [the creditor's] approval while knowing that the boat (and its proceeds) belonged to [the creditor]. Such a conversion qualifies as willful and malicious under § 523(a)(6)."); *Call Fed. Credit Union v. Sweeney (In re Sweeney),* 264 B.R. 866, 872 (Bankr.W.D.Ky.2001) (finding a debtor who cashed a two party check representing insurance proceeds intended to harm credit union when he converted the monies to his own use). This discerning of a

debtor's intent in the context of a conversion case is particularly difficult:

> The problem with conversion cases ... is that rarely are the debtors acting out of a desire to injure the creditors, even though the injury to the creditor, although not desired, is almost always substantially certain to result from a debtor's actions. Thus, the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is the result of a negligent or reckless tort—but not willful or malicious.

*Avco Fin. Servs. of Billings v. Kidd (In re Kidd),* 219 B.R. 278, 284 (Bankr.D.Mont. 1998). The distinction necessitates consideration of where a debtor's conduct falls within the broad continuum of what may constitute acts of conversion:

> The common law tort of conversion does not fall neatly into either of Justice Ginsberg's categories because the conduct it reaches spans both. At common law, a defendant who is shown to have exercised dominion over a plaintiff's property is liable for the resulting conversion, even where she reasonably and innocently believes the property is her own. At the other end of the spectrum, common law conversions encompasses torts, like embezzlement, that are also prosecutable as crimes.

*Haemonetics v. Dupre,* 238 B.R. 224, 229 (D.Mass.1999), *aff'd,* 229 F.3d 1133 (1st Cir.2000) (unpublished table decision).[53]

■ Conversion cases also require careful consideration of the nature of the injury suffered by the creditor when a court considers whether a debtor "intended" to cause the specific harm inflicted. As one court has observed:

> The creditor's true injury occurs on an abstract level. It is the debtor's invasion of the creditor's legally protected right. The court should focus on this injury, as opposed to the resulting damage, when it asks whether the injury was intentional. When it does so, the answer will usually be relatively obvious because the debtor's action is the injury. For example, in a case involving assault and battery, the true injury is not the creditor's broken jaw, but rather, the unconsented to touching that produced the broken jaw. Consequently, the question to ask is not whether the debtor intended to break the creditor's jaw, but instead, whether the debtor intended to hit the creditor. In defamation cases, the true injury is not the damage to the creditor's reputation; it is the publication of falsehoods about the creditor that led to the damaged reputation. Consequently, the proper question is not whether the debtor intended to injure the creditor's reputation, but instead, whether the debtor intended to publish the defamatory remarks. Similarly, in the conversion of collateral scenario, the true injury is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured. Consequently, the proper question is not whether the debtor intended that its secured creditor would

---

53. In Virginia "a person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller,* 261 Va. 561, 544 S.E.2d 666, 679 (2001) (citing *Hartzell Fan, Inc. v. Waco, Inc.,* 256 Va. 294, 505 S.E.2d 196, 201 (1998); *Bader v. Cent. Fid. Bank,* 289, 245 Va. 286, 427 S.E.2d 184, 186 (1993)).

go unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury.

*ABF, Inc. v. Russell (In re Russell),* 262 B.R. 449, 454–55 (Bankr.N.D.Ind.2001). See also *Ferraro v. Ballard (In re Ballard)* No. 00–07041–S, slip op. at 35 (Bankr E.D. Va. July 17, 2001).

Since *Geiger,* the malice prong of § 523(a)(6) appears unchanged. As Judge Tice of this Court recently explained:

Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same. See *In re Stanley,* 66 F.3d at 667, citing *St. Paul Fire & Marine Ins. Co. v. Vaughn,* 779 F.2d 1003, 1008–09 (4th Cir.1985). The Fourth Circuit defines malice as an act causing injury without just cause or excuse. See *In re Powers,* 227 B.R. at 73.

Debtor's subjective mind set is central to the inquiry as to whether debtor acted deliberately in knowing disregard of a creditor's rights in property. In fact, a plaintiff creditor can even establish malice on an implied basis from a showing of debtor's behavior, as well as a presentation of the surrounding circumstances. See *St. Paul Fire & Marine Ins. Co.,* 779 F.2d at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances, is sufficient under … § 523(a)(6)."); *Hagan v. McNallen (In re McNallen),* 62 F.3d 619, 625 (4th Cir.1995). What is required is that plaintiff prove that debt-

or's injurious act was done deliberately, intentionally and with knowing disregard for plaintiff's rights. See *In re Stanley,* 66 F.3d at 667.

*Johnson v. Davis (In re Davis),* 262 B.R. 663, 670–71 (Bankr.E.D.Va.2001).

■ Finally, this Court is reminded that "[s]ince a debtor in a § 523(a)(6) case is unlikely to admit that he or she intended to cause injury, or that he or she was substantially certain that injury would result, this state of mind can be established through circumstantial evidence." *In re Sweeney,* 264 B.R. at 872 (citing *Harr v. Harr (In re Harr),* 2000 WL 620799, at *6 (Bankr.S.D.Ohio 2000)).

■ Against this backdrop, this Court must assess whether the conduct of McKnew constitutes "willful and malicious injury" prohibiting the discharge of McKnew's excessive withdrawals from KMK and his guaranteed debt to Diversified. First, as to KMK, this Court concludes that McKnew, Kidd and Kelley agreed McKnew's compensation was limited to $10,000.00 the first year of operation and $10,417.00 the second year. While McKnew has asserted there was no compensation agreement or in the alternative his agreement was he could pay himself as the cash flow allowed in accordance with his family needs, this Court does not find such assertions credible. Rather, the evidence here establishes McKnew agreed to the compensation levels imposed by Kelley and accepted by Kidd; and McKnew was fully aware of these limitations even while he removed substantially greater amounts and promulgated materially false financial information to hide these withdrawals from Kelley and Kidd.

But was this conversion of monies from KMK intentional, or merely "innocent" or "technical?" The circumstantial evidence here confirms McKnew's conversion was

hardly innocent; the Court believes McKnew was fully aware of his compensation limitation and chose almost immediately to take amounts of money substantially in excess of his authorized agreement. It is of little consequence that McKnew probably did not intend his generosity to himself to cause as much financial harm to KMK as resulted. McKnew doubtlessly all the while hoped KMK would survive despite his striping it of substantially more monies than the agreement authorized, if for no other reason than to continue to supply his excessive financial needs.

It is not necessary to conclude McKnew intended to almost fatally disable KMK by his excessive payments to himself. As the true injury suffered by KMK was McKnew's permanent removal of the monies to which he had no right or entitlement, McKnew's specific intent to cause injury must only reach this result. There is no evidence McKnew ever intended to replace or pay back these excess monies; rather, there is substantial evidence McKnew intended to permanently deprive KMK of its dominion over and use of the additional funds taken by McKnew, and it shows he intended to hide his conversion of these monies from Kelley and Kidd. McKnew intended to relieve KMK of a substantial and essential amount of its capital; his very actions achieved this result. These actions, even after *Geiger*, constitute a willful and malicious conversion of monies from KMK for which this court must deny discharge under § 523(a)(6) of the Bankruptcy Code.

■ The non-dischargeability of Diversified's indebtedness under § 523(a)(6) is a more difficult analysis. Prior to *Geiger*, it is doubtless, that presented these same facts, a court would likely conclude McKnew's intentional act of violating the restriction on the loaned Diversified monies and using them to pay administrative expenses of KMK, including presumably his compensation, would constitute a willful and malicious injury. It would matter little whether McKnew intended to cause the ultimate harm suffered by Diversified; instead, the intentional act of McKnew which resulted in the injury to Diversified would prohibit discharge. After *Geiger*, the inquiry must, of course, focus on the subjective intent of McKnew in violating the Diversified loan restrictions.

Here again, the inquiry logically turns on Diversified's true injury. Critical to this analysis is answering a single question; does Diversified's failure to receive repayment of its loan constitute its injury,[54] or as afore-described in the instance of KMK, is the actual injury the removal of the monies loaned by Diversified from their intended purpose as factoring capital, which resulted from McKnew ignoring the use restrictions imposed by Kelley? In other words, is the sin committed by McKnew the fact he ignored the usage covenant and thereby "converted" the Diversified monies? If the consequence which constitutes the intended injury sustained by Diversified, is the failure of Diversified to receive repayment of its loan, then the evidence here is likely deficient to bar discharge in light of the required *Geiger* analysis.

The evidence compels this Court to hold the Diversified monies injected into KMK were expressly restricted for use solely to purchase receivables; less clear is the evidence that McKnew intended, or reasonably believed it was substantially certain,

---

54. Kelley testified the Diversified loan's principal amount of $100,000.00 remains unpaid, while the interest is current (Tr. at 216.)

his violations of the restrictions on the Diversified monies would prevent KMK from repaying this loan. McKnew apparently believes his actions had no detrimental financial impact on KMK, nor did he impair KMK's ability to repay the Diversified loan. This assertion, of course, is substantially contrary to Kelley's testimony that, upon the discovery of McKnew's excessive compensation in late September 1998, KMK was essentially broke, unable to make payroll or borrow additional monies from the Cenit line of credit. However, while one can certainly speculate that the mere act of diverting these monies from the purchase of receivables would logically increase the likelihood of Diversified losing these funds, there is likely not sufficient evidence here to prove that, by wrongfully utilizing the Diversified monies,

McKnew intended the consequence that Diversified would not receive repayment.

Fortuitously for Diversified, this Court believes the factual circumstances in this case suggest the proper analysis of the intended harm to Diversified is very similar to the conclusions reached as to the excess KMK monies removed. In essence, like the excessive compensation wrongfully removed by McKnew, McKnew converted the Diversified loaned monies when he ignored the restrictions thereupon and disbursed these funds beyond the control of KMK in an unauthorized manner. Also, like the excessive compensation removed by McKnew, KMK expended these Diversified monies at McKnew's direction, and, whether paid directly to him or others, he intended to permanently place these monies beyond the reach of KMK.[55] As such,

**55.** While ordinarily misappropriating money is not conversion, if the creditor has entrusted the money to a defendant for a specific purpose, and he diverts the money to another and unauthorized use, that may constitute conversion. *See, e.g., Unified Services, Inc. v. Home Insurance Co.,* 218 Ga.App. 85, 460 S.E.2d 545 (1995) (holding an insurer could maintain a conversion action for premiums a broker failed to remit to it); *Ferguson v. Coronado Oil Co.,* 884 P.2d 971 (Wyo.1994) (finding a defendant converted plaintiff's percentage of net profits from oil field); *Tidwell v. Wedgestone Fin. (In re Hercules Auto. Prods., Inc.),* 245 B.R. 903, 912 (Bankr.M.D.Ga.1999) (holding Georgia state courts recognize claims for conversion of money and "earmarking" for a specific purpose overcomes the presumption that one in possession of money has title to it); *Burmeister v. Wilcox (In re Wilcox),* 194 B.R. 631, 635 (Bankr.W.D.Mo. 1996) (holding under Missouri law, conversion does not lie for money representing a general debt, but conversion will lie for diversion of funds held in the custody of another for a specific purpose); *Eva v. Midwest Nat'l Mortgage Bank, Inc.,* 143 F.Supp.2d 862, 896–97 (N.D.Ohio 2001) (stating under Ohio law, with respect to conversion of money, a claim is proper where the funds in question were specific or sequestered, identifiable monies or funds were entrusted to the defendant's care);

*Biermann v. Gus Shaffar Ford,* 805 S.W.2d 314, 318–19 (Mo.Ct.App.1991) (holding that money given to a car dealer as down payment on a car was subject to conversion); *Conseco Group Risk Mgmt. Co. v. Ahrens Fin. Sys., Inc.,* No. 00 C 5467, 2001 WL 219627, at \*12 (N.D.Ill.2001) (finding that under Illinois law, a conversion may arise if the money is specified in an identifiable fund). *But see Hutchings v. Torrey,* 203 Misc. 1038, 119 N.Y.S.2d 119, 120 (1953) (holding when plaintiff loaned money to purchase an automobile agency and there was a failure to repay, action for conversion did not lie because plaintiff must show identical money paid to defendant actually belonged to plaintiff). *Compare P & S X–Ray Co., Inc. v. Dawes,* 189 B.R. 714, 724 (Bankr.N.D.Ill.1995) (holding no conversion shown where down payments were paid without any "earmarking" or restriction of use); *Lisk v. Criswell (In re Criswell),* 52 B.R. 184, 203 (Bankr.E.D.Va.1985) (holding funds advanced on construction contract were not subject to conversion because funds, on delivery, were no longer property of creditor). Whether a transaction creates a trust relationship or that of debtor and creditor depends upon all the facts and circumstances including the intention of the parties. *U.S. v. Orsinger,* 428 F.2d 1105, 1111 (D.C.Cir.1970). The fact that the transaction requires interest is, of course, evidence that a debt is created

McKnew converted the Diversified monies just as surely as McKnew converted the monies of KMK by helping himself to substantially more compensation than authorized.[56] Here, McKnew exercised an "act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *See Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 679 (2001).[57] As the "true injury [in a conversion] is not that the creditor's debt goes unpaid," *In re Russell*, 262 B.R. at 454–55, the proper inquiry here is whether the debtor improperly used the creditor's monies for a purpose other than the restricted use of these funds. McKnew surely intended the removal of the Diversified loan proceeds from KMK for utilization in an unauthorized manner and intended to permanently place the proceeds beyond the reach of KMK. The unauthorized usage of the Diversified loaned monies was done by McKnew without just cause or excuse.[58] Accordingly, this Court concludes

as distinguished from a trust obligation, but it is not conclusive. The evidence may justify a jury finding that notwithstanding the payment of interest the recipient of the money held it in trust. *Id.* (citations omitted). While apparently no Virginia case has considered circumstances similar to the instant matter, this Court believes a Virginia court would conclude the use restriction on the Diversified monies are sufficient to support a claim for conversion when dissipated by McKnew to himself and others in knowing violation of the covenant to utilize these monies only to purchase commissions. Thereby, this instant matter removes this case from those denying a conversion cause where the parties relationship is merely that of debtor and creditor. McKnew acknowledged the limited use of the Diversified monies.

56. This analysis raises a dilemma for the Court in the calculation of damages incurred, in that it is possible some of the monies (but uncertain as to the amounts thereof) used to pay McKnew's excessive compensation are the same monies represented by the Diversified loan, suggesting a "double-counting" concern. *See infra* Section IV and note 61.

57. It is well-settled that a debtor may convert money and negotiable instruments. *Federal Ins. Co. v. Smith*, 144 F.Supp.2d 507, 518, n. 25 (E.D.Va.2001) (citing *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 670 (4th Cir.1996)). "Moreover, where converted property has assumed altered forms, the owner may follow it as far as he can trace it and sue at law for the substituted property or he may hold the wrongdoer liable for appropriate damages." *Id.* (citing 18 Am.Jur.2d, Conversion, § 146; *Porter v. Roseman*, 165 Ind. 255, 74 N.E. 1105, 1106 (1905)). Under Virginia law, an officer or director of a corpora-

tion is liable only for those intentional torts he or she commits or authorizes on behalf of the corporation. *Airlines Reporting Corp. v. Pishvaian*, 155 F.Supp.2d 659, 666 (E.D.Va. 2001) (citing *Sit–Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921 (4th Cir.1984); *Miller v. Quarles*, 242 Va. 343, 410 S.E.2d 639 (1991); *Cook v. 1031 Exch. Corp.*, 29 Va. Cir. 302, 1992 WL 885015 (Va. Cir. Ct.1992)). Although the plaintiff need not show the defendant personally benefitted from the conversion, plaintiff must establish the defendant participated in, ratified or otherwise authorized the conversion. Virginia law limits conversion to wrongful conduct that is "exerted over property in denial of the owner's right." *Id.* (quoting *Universal C.I.T. Corp. v. Kaplan*, 198 Va. 67, 92 S.E.2d 359 (1956)) (citations omitted). Under Virginia law, only the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted, may maintain an action for conversion. *Economopoulos v. Kolaitis*, 259 Va. 806, 528 S.E.2d 714, 719 (2000) (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 440 S.E.2d 902, 906 (1994)). Here, Diversified could make a demand for return of its monies upon violation of the covenant not to utilize the proceeds of the loan except to finance purchase of receivables.

58. Unlike McKnew's protestations as to alleged lack of a salary agreement with Kelley and Kidd, he appears to offer no justification or excuse for his improper usage of the Diversified loan proceeds, save his memorandum of October 13, 1998, where he reverses his earlier written acknowledgment of the use restriction by claiming Kelley recently imposed such restriction.

McKnew's actions in improperly using and disbursing the Diversified loan proceeds constitutes a willful and malicious injury under § 523(a)(4) of the Bankruptcy Code.

## IV

## DAMAGES

Having found the indebtedness of McKnew to KMK, for the excess compensation non-dischargeable, and having determined McKnew's obligation to Diversified is non-dischargeable, it remains for this Court to determine the amount of damages sustained by KMK and Diversified.

 The measure of damages for conversion in Virginia, where conversion is complete, is the value of the property converted at the time and place of conversion. *Straley v. Fisher*, 176 Va. 163, 10 S.E.2d 551, 553 (1940). The measure for fraud, where damages are limited to actual pecuniary loss, is similar. *Celeste v. Bayliss*, Law No. 4460, 1986 WL 401809 (Va. Cir. Ct. July 23, 1986). Here, KMK has detailed total damages of $224,279.58 from McKnew's wrongful conduct,[59] comprised of $225,606.67 in excessive compensation withdrawn by McKnew, plus $6,083.29 in personal items McKnew purchased with KMK funds, reduced by $7,410.38 in unreimbursed expenses, which KMK agrees were proper expenses.

McKnew seeks to reduce this sum by two arguments. First, he testified to a dispute as to the amount of compensation received of approximately $9,500.00. However, McKnew could give no specificity whatsoever as to any incorrect items or elements. Without any evidence to support this claim before the Court, this Court must discard this argument. McKnew also seeks to reduce the damages incurred by KMK by his factual contentions that (1) the agreed amount of compensation for the year 1998 was actually $12,732.22, and (2) there was no agreement that McKnew could only derive his compensation from venture capital or earnings. So, therefore, there is no legal justification for KMK's position McKnew could not properly receive any compensation after late November 1997, when KMK had exhausted all venture capital.

This Court has carefully examined these factual contentions of McKnew and rejects them.[60] KMK has proven by a preponderance of the evidence, for reasons detailed here, that McKnew, Kelley and Kidd, agreed to limit McKnew's compensation to $10,000.00 each the first year and $10,417.00 per month the second year, and they further agreed to limit his salary to available venture capital or KMK earnings. KMK's damages assertion is in accordance with this finding. Furthermore, the Court has examined the detailed evidence of McKnew's personal purchases from KMK funds, compiled largely by Mrs. Kelley, and finds these calculations support the position of KMK that $6,083.29 worth of McKnew's personal purchases properly constitute additional damages sustained by KMK as a proximate result of the debtor's wrongful acts.[61]

---

59. *See supra* note 33.

60. *See supra* Findings of Facts.

61. The plaintiffs assert in their pleadings McKnew's salary was $10,000 per month for 1997 and $12,732.22 per month for 1998, and the debtor may only derive this salary from start-up capital or net earnings. (Compl.¶ 9.)

However, at trial, the plaintiffs assert the salary agreement was $10,000 per month in 1997 and $10,417 per month in 1998. (Tr. at 214, 218, 374.) Therefore, this court must determine whether the final result may vary from the amount pled.

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as

A final consideration is necessary in the assessment of KMK's damages. The Virginia L.L.C. Act imposes a limitation of liability in an action by the limited liability company against a member, or manager, limiting such liability to the greater of $100,000.00 or the amount of cash compensation received by the member or manager from the limited liability company during the twelve months preceding the act or omission from which the company seeks damages.[62] However, this statutory provision is expressly not applicable to instances of "willful misconduct." While the Virginia L.L.C. Act does not define this term, surely the fraud, embezzlement and willful and malicious acts of McKnew constitute "willful misconduct" sufficient to prevent application of this statutory damage limitation.[63]

---

if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." FED. R. BANKR. P. 7015(b). According to *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), motions to amend the pleadings shall be freely allowed. The Fourth Circuit holds "a motion to amend should be denied only where the motion has been unduly delayed and 'where allowing the amendment would unduly prejudice the non-movant.' " *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 482 (4th Cir.1992) (quoting *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir.1987)); *Lubman v. C.A. Guard Masonry Contractor, Inc. (In re Gem Construction Corp. of Virginia)*, 262 B.R. 638 (Bankr.E.D.Va. 2000). Furthermore, a court may on its own initiative amend the pleadings to conform to the evidence. *First American Title Ins. Co. v. Lett (In re Lett)*, 238 B.R. 167, 187–88 (Bankr. W.D.Mo.1999).

In the case at issue, the plaintiffs never moved to amend the pleadings in order to assert their claim for a larger damages amount, which would result from a deduction of a lesser amount of salary from the actual amount paid to McKnew. Instead, both the plaintiffs and the defendant offered testimony at trial about the proper salary amount. Thus, as the Ninth Circuit aptly stated, "the lack of an amendment will not affect a judgment in any way. 'Failure to formally amend the pleadings will not jeopardize a verdict or judgment based upon competent evidence.' " *Dunn v. Trans World Airlines, Inc.*, 589 F.2d 408, 412–13 (9th Cir.1978) (quoting *Decker v. Korth*, 219 F.2d 732, 739 (10th Cir.1955)). Therefore, this Court holds the plaintiffs' damages are not limited to the amount speci-

fied in the pleadings but such damages shall conform to the findings of fact that the debtor's salary agreement was $10,000 per month in 1997 and $10,417 in 1998.

**62.** Va.Code Ann. § 13.1–1025 (1999) provides as follows:

A. In any proceeding brought by or in the right of a limited liability company or brought by or on behalf of members of the limited liability company, the damages assessed against a manager or member arising out of a single transaction, occurrence or course of conduct shall not exceed the lesser of:

1. The monetary amount, including the elimination of liability, specified in writing in the articles of organization or an operating agreement as a limitation on or elimination of the liability of the manager or member; or

2. The greater of (i) $100,000 or (ii) the amount of cash compensation received by the manager or member from the limited liability company during the twelve months immediately preceding the act or omission for which liability was imposed.

B. The liability of a manager or member shall not be limited as provided in this section to the extent otherwise provided in writing in the articles of organization or an operating agreement, or if the manager or member engaged in willful misconduct or a knowing violation of the criminal law.

C. No limitation on or elimination of liability adopted pursuant to this section may be affected by any amendment of the articles of organization or operating agreement with respect to any act or omission occurring before such amendment.

Va.Code Ann. § 13.1–1025 (1999).

**63.** The Operating Agreement and the organizational articles of KMK contain no provi-

■ As to Diversified, Kelley testified without dispute that Diversified never recovered the entire Diversified loan proceeds of $100,000.00, and neither KMK nor McKnew ever repaid the loan. Where a creditor has entrusted a debtor with money for use for a specific purpose and the debtor has no intention of using it in that manner, courts have held non-dischargeable the amount of the loan not used in the required manner. *In re Sheridan*, 57 F.3d at 636 (citing *In re Segala*, 133 B.R. 261, 264 (Bankr.D.Mass.1991)); *Beverly Enters. v. Eversole (In re Eversole)*, 110 B.R. 318, 323 (Bankr.S.D.Ohio 1990); *In re Norton*, 34 B.R. 666, 668 (Bankr.D.Ariz. 1983). In such cases, "the debtor had put either no money or only a portion of the proceeds toward the purpose given in its loan request." *Id.* Here Kelley testified that, by the time of the discovery of McKnew's misconduct in September 1998, KMK had insufficient funds to operate and it could not make its upcoming payroll without the ability to draw any monies upon its line of credit with Cenit Bank. Thus, by September 1998, KMK had expended all its cash, venture capital, and factoring capital, including all of the Diversified monies. Furthermore, the evidence here is clear that Diversified would not have loaned the monies to KMK without the imposition of the usage restriction, and it relied upon McKnew's assurances he would honor this obligation. *See In re Eversole*, 110 B.R. at 323 (holding that a creditor sustained a loss of entire amount of a loan because "[h]ad either [of the creditor's agents] been advised of the debtor's actual intent with respect to the loan, [the creditor] would not have lent the money to the debtor or the partnership"). These circumstances provide adequate proof that McKnew, by his exhaustion of all monetary sources at KMK, including the Cenit line of credit used to fund the purchase of commission receivables, used the Diversified monies for purposes other than the funding as agreed at the outset of the loan. Accordingly, Diversified has established by a preponderance of the evidence that McKnew's wrongful acts have damaged it in the amount of $100,000.00.[64]

## Summary

This Court concludes McKnew wrongfully removed monies to which he had no legal entitlement from KMK, which indebtedness constitutes fraud pursuant to § 523(a)(2), embezzlement pursuant to § 523(a)(4) and willful and malicious injury pursuant to § 523(a)(6) of the Bankruptcy Code and therefore, this indebtedness is non-dischargeable. The Court further finds McKnew's indebtedness to Diversified is non-dischargeable pursuant to § 523(a)(2) and § 523(a)(6) of the Bankruptcy Code.

IT IS SO ORDERED.

It is further ORDERED that the Clerk shall forward a copy of this Memorandum

---

sions limiting liability for a member or manager. Section 12(a)(3) of the Operating Agreement requires each manager to indemnify KMK for any liability or expense incurred by reason of any act of his constituting gross negligence, willful misconduct or willful misrepresentation. (Def.Ex. AF.)

64. It is possible, if not likely, that some portion of Diversified's $100,000.00 in damages constituted some of the excess compensation wrongfully removed by McKnew. Accordingly, it is arguable that the assessment of the damages on behalf of KMK and Diversified in essence "double count" some of the dollars wrongfully diverted from Diversified and used to pay McKnew. However, as the damages suffered by each entity are separate and distinct respectively, this Court believes it is inappropriate to attempt to unravel exactly which of Diversified's dollars McKnew utilized for each illicit application, whether for his permitted compensation, his wrongfully removed compensation, or otherwise.

Opinion and Order to Peter V. Chuisano, counsel for KMK and Diversified, and to David K. Spiro, counsel for McKnew.